# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1212

_____

George L. Gipson,                                    *
                                                     *
    Plaintiff - Appellant,                       *
                                                     *   Appeal from the United States
v.                                                   *   District Court for the
                                                     *   Eastern District of Missouri.
KAS Snacktime Company,                               *
                                                     *
    Defendant - Appellee.                        *

_____

Submitted:  September 25, 1998
Filed: March 12, 1999

_____

Before LOKEN, JOHN R. GIBSON, and KELLY,[1] Circuit Judges.

_____

LOKEN, Circuit Judge.

In July 1991, George L. Gipson, an African-American, sued his employer, KAS Snacktime Company ("KAS"), asserting claims of race discrimination in employment in violation of Title VII and the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. §§ 213.010-213.095. Gipson's claims were based upon the allegedly racist conduct of his former supervisor, Rick Brank. The district court dismissed the

_____

[1]Regrettably, the Honorable John D. Kelly passed away on October 21, 1998.

MHRA claims as time-barred or not administratively exhausted. A bench trial resulted in a judgment in KAS's favor on the Title VII claims, based upon the court's finding that Gipson's acrimonious relationship with Brank "was not due to racial bias."

Gipson appealed. In an earlier decision, we affirmed all but the dismissal of Gipson's hostile work environment claim under the MHRA as time-barred. As to that claim, because Gipson's charge to the Missouri agency and his summary judgment response to the court alleged continuing racial harassment by Brank until February 1991, well within the MHRA statute of limitations period, we reversed the dismissal and remanded for further proceedings. Gipson v. KAS Snacktime Co., 83 F.3d 225, 229-30 (8th Cir. 1996) ("Gipson I"). On remand, at the conclusion of an unusual evidentiary procedure urged by Gipson's counsel, the district court[2] granted KAS judgment as a matter of law on this claim. Gipson again appeals. We affirm.

As relevant to this appeal, Gipson I established two ground rules for the proceedings on remand: first, Gipson had sufficiently *alleged* a continuing hostile work environment violation. That claim is not time-barred if the harassment continued after July 27, 1989, when the two-year statute of limitations began to run. Second, if Gipson *proves* a hostile work environment violation, he may only recover damages incurred after July 27, 1989. See 83 F.3d at 229-30. On remand, both parties made the district court's task unnecessarily difficult, KAS by urging the court to ignore the first part of this law of the case, and Gipson by urging the court to treat the second part as implicitly overruled by later Eighth Circuit cases.[3] The court

---

[2]The HONORABLE STEPHEN N. LIMBAUGH, United States District Judge for the Eastern District of Missouri.

[3]We decided in Gipson I that damages for continuing employment discrimination violations are limited to the relevant statute of limitations period, based upon our unanimous en banc decision in Ashley v. Boyle's Famous Corned

instead kept the parties within the legal parameters of Gipson I, which resulted in the following trial procedure.

On the eve of trial, KAS filed a motion in limine to exclude *all* of Gipson's evidence, complaining that Gipson was attempting to retry his entire case under the guise of a hostile work environment claim. Gipson responded, in essence, that everything relevant to his unsuccessful disparate treatment claims was also relevant to his hostile work environment claim. The district court applied Gipson I in resolving this issue. Noting that Gipson could only recover damages incurred after July 27, 1989, but that evidence of racial harassment prior to July 1989 might be relevant in proving that racial harassment occurred during the damage period, the court ruled:

> plaintiff will be restricted to that evidence which has some probative value on the issue of whether Brank's treatment of plaintiff was motivated by a racially discriminatory attitude, and if so, whether Brank's discriminatory conduct was so severe or pervasive that it created a work environment abusive to the plaintiff.

---

Beef Co., 66 F.3d 164 (8th Cir. 1995). In the district court and again on appeal, Gipson argues this decision was implicitly overruled by Jenson v. Eveleth Taconite Co., 130 F.3d 1287 (8th Cir. 1997), cert. denied, 118 S. Ct. 2370 (1998); Delph v. Dr. Pepper Bottling Co. of Paragould, Inc., 130 F.3d 349 (8th Cir. 1997); and Varner v. National Super Markets, Inc., 94 F.3d 1209 (8th Cir. 1996), cert. denied, 117 S. Ct. 946 (1997). We have carefully reviewed those later decisions and conclude, not surprisingly, that none addressed the damages question at issue in Ashley and Gipson I. Eighth Circuit panels do not "overrule" one another and certainly do not act in conflict with prior decisions of the court en banc. Until modified or overruled by the court en banc, Ashley and Gipson I are the law of this Circuit (with the obvious caveat that Gipson I involved a damages issue under Missouri law and therefore may be affected by subsequent decisions of the Missouri Supreme Court).

Five days later, after selecting a jury and further discussing these evidentiary issues with counsel informally, the court put the results of these discussions on the record, outside the jury's presence. Reducing rather lengthy remarks to what is essential for purposes of this appeal, the court stated:

> The plaintiff, in order to show a continuing pattern of the creation of the hostile work environment claim, want[s] to elicit evidence that occurred before July the 27th, 1989.
>
> It is the opinion of the Court, as we had discussed informally with counsel off the record, that I think that could conceivably come in under a so-called continuing violation doctrine, provided that there were clear racial overtones.
>
> * * * * *
>
> Counsel for the plaintiff indicated that she felt that this restricted her from presenting the case as she would prefer to present it, and that as a result, if she did, in fact, present the evidence of the [one] incident, that does have obvious clear racial overtones, that it would not be sufficient, in and of itself, to show a continuing pattern.
>
> * * * * *
>
> We . . . discussed th[e] possibility [that counsel] could very easily make the record on appeal simply by . . . an offer of proof as to what the various testimony would be . . . so that could constitute a record which could be subject to an ultimate appeal. . . . I'm a little concerned about whether this will be an effective record for which the Appellate Court could make a decision. . . . [But if] counsel feels we could do this . . . and that we can develop a record that is appealable, and that is something the Court of Appeals can, in fact, consider and make an ultimate determination on, why, I am ready to do it.

After further discussion both on and off the record, and at the urging of counsel for Gipson, the court agreed to send the jury home for the day and to proceed by means of an offer of proof by Gipson's counsel of the evidence she intended to introduce at trial. Counsel then offered to prove the following:

– At Gipson and Brank's first meeting in July 1987, Brank refused to shake hands, refused to acknowledge Gipson's gift of a company jacket, and told Gipson to "[f]ire the fat black guy that wears glasses, because he just doesn't fit in around here," referring to Lionel Harris, the only black district sales manager. Told that Harris was a top performer, Brank replied, "I don't care, I want him fired."

– In August 1987, Brank threatened to fire Gipson if he ever walked in front of him into a store. Later that month, Brank accused Gipson of not returning a telephone call, threatened to rip his head off, and advised Gipson to look for another job. One morning when Gipson arrived at work, Brank demanded to know where he had been, commenting that he should "rip [Gipson's] head off, and if it was ten years ago, I would do it."

– In the fall of 1987, Brank rejected Gipson's recommendation of a pay increase for Lionel Harris, commenting that Harris was "not going to get a raise as long as I'm here," and that it was "personal." Around that time, Brank gave Gipson an unfair performance appraisal, said he'd be reevaluated in 90 days, and began to issue unwarranted or untrue written reprimands. When Gipson asked Brank for a performance review at the end of the 90 days, Brank refused and threatened to fire him.

– In October 1987, during an acrimonious exchange about coffee in the office, Brank threatened "to rip [Gipson's] head off" and called him a "dumb nigger."

– In February 1988, Gipson complained to KAS's Director of Human Resources, Charles Kester, about Brank's abusive treatment. In a subsequent

meeting with KAS officials and Brank, Gipson accused Brank of racial discrimination and asked KAS to investigate. Characterizing the conflict as a communications problem, the KAS officials declined to investigate and asked Brank and Gipson to put their differences behind them. In June 1988, Brank's supervisor told Gipson: "I don't want to hear anything about discrimination, don't talk to me about it."

– Brank belittled and criticized Gipson for trivial matters in front of subordinate managers. During a 1988 meeting with district sales managers, Brank accused Gipson of not making eye contact with him and threatened to "slap the hell out of" him and fire him if this persisted.

– In the fall of 1988, Brank put Gipson on probation and advised him several times to quit. Brank warned Gipson that if KAS had to fire him, they would make sure he'd never work in the industry again. In February 1989, Brank told Gipson he had survived the probationary period but was not off the hook.

– In January 1989, Gipson again asked Kester to investigate Brank's racial discrimination. Kester declined to take action. Brank later told Gipson that Kester had told Brank about the meeting, and nothing would save Gipson.

– In March 1989, Gipson was demoted from regional sales manager to district sales manager and assigned to a rural sales territory far from his home.

– In November 1990, Gipson's new supervisor, regional sales manager Ralph Marler, gave Gipson an unfair written reprimand.

– During a December 1990 business outing (not otherwise described), Brank told Gipson to quit because KAS didn't need his "kind."

– In January 1991, Gipson was reassigned to the St. Louis office while Brank was on vacation. When Brank returned, he told Gipson, " If you say one negative thing, you'll be fired." When Gipson replied that he wanted to be treated with respect, Brank suspended him and ordered him off the company premises. Two days later, "someone else" told Gipson to return to work. Brank left KAS shortly thereafter.

After hearing Gipson's offer of proof and the arguments of counsel, the district court concluded the October 1987 coffee incident in which Brank allegedly made "an extremely offensive racial comment" to Gipson is admissible evidence of continuing racial harassment, but Gipson has no evidence of racial harassment occurring after July 27, 1989, and therefore Gipson could not "make a submissible case to the jury showing a continuing pattern of racial harassment sufficient to make [his] workplace hostile." The court entered judgment for KAS. Gipson did not object to this trial procedure. On appeal, he asks us to reverse the adverse judgment, overrule Gipson I, and rule that his punitive and emotional distress damage claims should be submitted to a jury.

## II.

Gipson argues his offer of proof contained sufficient evidence for a jury to find that KAS committed a continuing violation of the MHRA by maintaining a racially hostile work environment. The MHRA prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." Mo. Rev. Stat. § 213.055. In applying the MHRA, we "are guided not only by Missouri law but also by federal employment discrimination decisions which are applicable and authoritative under the MHRA." Tart v. Hill Behan Lumber Co., 31 F.3d 668, 671 (8th Cir. 1994) (quotation omitted); see Swyers v. Thermal Science, Inc., 887 S.W.2d 655, 656 (Mo. App.1994).

An employer violates Title VII if "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citations omitted). The same standards are generally used to evaluate claims of hostile work environment based upon sexual harassment and racial harassment. See Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2283 n.1 (1998); Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66-67 (1986). In determining whether a workplace environment was sufficiently hostile or abusive, we look at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. See White v. Honeywell, Inc., 141 F.3d 1270, 1275 (8th Cir. 1998).

When an employer is accused of a continuing violation that began prior to the statute of limitations period, such as a racially discriminatory hostile work environment, the employee must prove that the violation continued into the limitations period; "the critical question is whether any present *violation* exists." United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977) (emphasis in original); see Ashley, 66 F.3d at 167-68. Therefore, to avoid the claim being time-barred, Gipson's offer of proof must be sufficient to show that after July 27, 1989, he was a victim of intimidation, ridicule, and insult on account of his race that was sufficiently severe or pervasive to alter the conditions of his employment. We therefore look first at Gipson's offer of proof concerning his work environment after July 27, 1989.

In March 1989, Gipson was demoted to district sales manager and transferred from the St. Louis office to a rural sales route. This took him out from under Brank's direct supervision. Gipson's offer of proof ignored the period from March 1989 to November 1990, except to complain he was forced to work in a rural area far from his home. There is no evidence Gipson had *any* contact with Brank from the time of the

-8-

demotion until December 1990.  Thus, Gipson presented no evidence of a hostile work environment from July 1989 to late 1990, the first sixteen or seventeen months of the limitations period.

Gipson's offer of proof included only three alleged instances of racial harassment in the limitations period.  In November 1990, he received a written reprimand containing "incorrect facts" from Marler, who reported to Brank but was not accused of racial animus.  In December 1990, Brank made an offensive and racially-tinged comment ("your kind") at some sort of business outing.  In January 1991, Gipson was reassigned to St. Louis and had an unpleasant run-in with Brank shortly thereafter.  Brank then left KAS in February 1991.  We conclude this evidence, standing alone, is insufficient to establish an actionable hostile work environment.

Marler's work-related reprimand was neither racial nor harassment.  Brank's comments in December 1990 and January 1991, and his peremptory suspension of Gipson, might well permit an inference of racial animus, particularly when viewed in the context of Brank's more explicitly racial comments prior to July 1989. Compare Delph, 130 F.3d at 356-57.  However, viewed under the totality of the post-July 1989 circumstances, these two incidents are neither severe nor pervasive enough to create a hostile work environment.  The Supreme Court has repeatedly emphasized that this cause of action is limited to extreme work conditions.  See Faragher, 118 S. Ct. at 2284 ("conduct must be extreme to amount to a change in the terms and conditions of employment"); Oncale v. Sundowner Offshore Serv., Inc., 118 S. Ct. 998, 1003 (1998), and cases cited.  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive" -- is not actionable.  Harris, 510 U.S. at 21.

Likewise, our cases upholding hostile work environment liability have invariably presented far more hostile or abusive circumstances. See, e.g., Bailey v. Runyon, No. 98-1030, slip op. at 6-7 (8th Cir. Feb. 8, 1999) (repeated unwelcome sexual advances); Hathaway v. Runyon, 132 F.3d 1214, 1222 (8th Cir. 1997) (physical sexual overtures followed by eight months of intimidating snickers); Delph, 130 F.3d at 352 (intimidation plus "a steady barrage of racial name-calling"); Ways v. City of Lincoln, 871 F.2d 750, 755 (8th Cir. 1989) (evidence included fifty examples of racial harassment); Hall v. Gus Constr. Co., 842 F.2d 1010, 1012 (8th Cir. 1988) (incessant verbal abuse and offensive physical touching); Gilbert v. City of Little Rock, 722 F.2d 1390, 1394 (8th Cir. 1983) ("more than a few isolated incidents of harassment must have occurred"), cert. denied, 466 U.S. 972 (1984). Brank's alleged behavior in December 1990 and January 1991, though undeniably offensive and rude, was not so severe that a reasonable person would find the terms or conditions of Gipson's work environment had been altered.

Most of Gipson's offer of proof related to Brank's alleged conduct prior to July 1989. In proving a claim of hostile work environment, background evidence from the pre-limitations period may be relevant to illuminate whether the plaintiff's work environment during the limitations period was sufficiently hostile or abusive. But here, there was a twenty-one month period from March 1989 to December 1990 in which there was no alleged contact between Gipson and Brank. A complete break of this magnitude precludes a finding that a racially hostile work environment existing at the time of Gipson's demotion by reason of Brank's harassment continued unabated until Gipson was transferred back to the St. Louis office. See Garrison v. Burke, 1999 WL 13515 at *5 (7th Cir. Jan. 14 1999) (two year respite from harassment precludes finding of continuing violation); Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 716 (3d Cir. 1997) (seven month gap between harassing incidents allowed "effects of prior incidents to dissipate"), cert. denied, 118 S. Ct. 1079 (1998). Thus, as the district court perceived, this evidence was not relevant to

the question whether Gipson was the victim of a  hostile work environment after November 1990.

Because Gipson failed to prove a hostile work environment at any time after July 27, 1989, this MHRA claim is time-barred, without regard to whether Gipson's offer of proof was sufficient to support an inference that Brank's conduct was, in general, motivated by racial bias.  As to this latter question, the district court may well have applied an unduly restrictive test in excluding pre-limitations period evidence because it lacked "clear racial overtones."  In addition to Brank's racially offensive comment in October 1987, some of his other alleged conduct, such as his treatment of Gipson the first day they met in July 1987, seems relevant in proving that his continuing conduct toward Gipson was racially motivated.  But absent evidence of a hostile work environment violation in the limitations period, any such evidentiary errors were obviously harmless.

The judgment of the district court is affirmed.  Because we affirm the district court's judgment of dismissal, we need not reach the punitive damages and emotional distress damages issues raised by Gipson on appeal.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.