101 F.Supp.2d 805 (2000)
Catherine NOFLES, Plaintiff,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., Defendant.
No. 4:98CV1369 RWS.
United States District Court, E.D. Missouri, Eastern Division.
May 18, 2000.
*806 *807 Ronald L. Rothman, Christopher C. Oelzen, Librach and Rothman, St. Louis, MO, for Catherine Nofles,
*808 Timm W. Schowalter, Thompson Coburn, James N. Foster, Jr., Partner, Robert D. Younger, McMahon and Berger, St. Louis, MO, for State Farm Mutual Automobile Insurance Company, an Illinois Corporation, defendant.

MEMORANDUM AND ORDER
SIPPEL, District Judge.
Catherine Nofles was fired from her job as a claims representative at State Farm Mutual Automobile Insurance Company after she refused to submit to a company-ordered medical examination. Nofles later filed the instant lawsuit, claiming that State Farm intentionally discriminated against her and terminated her on account of her race, gender, disabilities and in retaliation for engaging in protected activity.
State Farm moves for summary judgment, contending that Nofles' claims are either time-barred or unsupported by evidence. Because the Court finds a genuine issue about whether Nofles' termination was motivated by racial and/or gender animus, her discriminatory discharge claim will not be decided by summary judgment. On all other claims, State Farm is entitled to judgment as a matter of law.

I. Facts

In accordance with Local Rule 4.05. State Farm submitted a statement of uncontroverted material facts in support of its motion for summary judgment, together with specific references to the record and accompanying exhibits. Nofles, however, failed to comply with Local Rule 4.05(E), which provides in relevant part:
Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine issue exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from the movant's listing of facts.
The consequence of Nofles' failure to comply is that "[a]ll matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party." Local Rule 4.05(E). Despite Nofles' failure to provide any citations to the record or evidence to support her claims, the Court has carefully reviewed the entire record submitted by State Farm to ensure that its factual statement is, indeed, uncontroverted.[1] The Court finds the following material facts are undisputed (unless indicated otherwise) from its review of the record.[2]
Nofles, an African-American female, began working for State Farm as a claim representative trainee in its Creve Coeur, Missouri office in 1987. She did not have a written employment contract. Nofles was subsequently transferred to the Westgate office and promoted to the position of senior claim representative on September 16, 1989. On November 9, 1991, Nofles was promoted again to claim specialist, a position which she held until her termination. During this time period, Nofles received ratings of "as expected" in her performance reviews, but was informed that she needed to work on improving her timeliness.
Problems allegedly arose after Larry Lueckenotte became Nofles' supervisor in 1992. Lueckenotte testified that he discussed Nofles' timeliness problems with her soon after he became her supervisor, but that she failed to correct the problem. *809 Between 1992 and 1996, Nofles received six evaluations rating her performance "as expected."
Nofles alleges that Lueckenotte subjected her to unwarranted criticism on account of her race and/or gender and/or in retaliation for engaging in protected activities by: 1) refusing to provide her with full authority to settle claims; 2) questioning her about a document she prepared; 3) talking about her arrangement of "friendly suits"; and 4) going through her mail and desk.
Nofles also contends that she was retaliated against for speaking to the attorney representing a former employee, Bob Eskridge, who filed a racial discrimination claim against State Farm. Although Lueckenotte was also Eskridge's supervisor, he did not work in the Westgate office with Nofles. According to Nofles, Eskridge's attorney contacted her at work to discuss her opinion of Lueckenotte as a supervisor. Nofles claims that she made several disparaging comments about Lueckenotte and the next day was called into the human resources department to discuss the details of the conversation with State Farm's attorney. Nofles does not identify any adverse employment action that was allegedly taken against her in retaliation for speaking to Eskridge's attorney, but she did testify that "things were really uncomfortable with [Lueckenotte] after that ...." Nofles, however, did not know whether Lueckenotte was ever informed about the substance of her conversation with Eskridge's attorney.
Nofles also claims that she was retaliated against for refusing to discriminate against a fellow employee. Nofles testified that she was asked to substantiate whether a black female co-worker used crack cocaine during her employment. Nofles refused to provide any information about her co-worker's alleged drug abuse. Nofles testified that she could not identify any adverse employment actions taken against her for refusing to participate in this alleged discriminatory conduct, "except for some reason, I still could never get above expected raises ...."
Nofles attributes the following incidents to race and/or gender animus: 1) in late 1995 or early 1996, a co-worker pointed out portions of the State Farm's management training manual which he believed were racially discriminatory; 2) in 1988, a co-worker said to Nofles, "Who do you think you are, staying late?"; 3) a co-worker once suggested that several of the employees, including Nofles, "go to a coon's restaurant" for lunch; and 4) in 1992, a co-worker told Nofles that she could not wear her hair "in a natural."
At some point between 1992 and 1994[3], Nofles informed Lueckenotte that she suffers from fibromyalgia and requested a new chair and telephone headset, presumably in response to this diagnosis.[4] Nofles also requested that she be allowed to work part-time or be reassigned to drive-through duty. State Farm complied with Nofles' request for a new chair and telephone headset, but told Nofles that she could not work part-time or on drive-through duty.
In 1996, State Farm decided to restructure its Automobile Claim Section in its Missouri offices. To facilitate the change, State Farm developed a transition plan which it unveiled to its employees in early 1996. Pursuant to the transition plan, State Farm created a competitive, merit-based system to evaluate its employees and match them to available positions within the company. Accordingly, all automobile claim employees in State Farm's Missouri offices were asked to complete an *810 Employee Selection Guide (ESG) consisting of: Section I, employee information including background, work experience and education; Section II, mobility and interest, including office locations where the employee was willing to work and positions which the employee was willing to accept following the reorganization; and Section III, special qualifications or achievements including job-related skills and abilities or significant contributions.
After completing the ESG, the employee delivered the form to her supervisor, who then completed Sections IV-VI of the ESG. Section IV consisted of a performance and history background, including salary ratings and insurance education. Section V was a competency rating of the employee in fourteen separate categories on a scale of one to five (one being the lowest and five the highest). Finally, Section VI included the supervisor's recommendation whether or not the employee should be retained in a position following reorganization.
After completing the ESG, the employee's direct supervisor then reviewed his competency ratings with the employee. If the employee disagreed with her evaluation, she could submit a written protest, which was attached to the ESG. The ESG was then forwarded the State Farm's selection team, which determined the need for each available position in each office and used the ESGs to make selections for each available position based on competitive comparisons of the ESGs. Those employees who were not selected for a position after reorganization were placed on the Transition Staff. The Transition Staff was expected to process certain pending bodily injury and uninsured motorist claims which were being handled by individuals who were transferred to new positions through reorganization. Employees assigned to the Transition Staff were requested to remain at State Farm until the reorganization was complete in January 1998.
Nofles completed Sections I, II and III of her ESG and indicated that she was qualified for and would only accept assignments to the positions of field claim representative, fire field representative or SIU representative. Nofles also stated that she would only be willing to work in Arizona or the greater St. Louis area. Nofles then submitted her ESG to Lueckenotte, who rated her a "three" (proficient) in twelve of the competency categories and a "two" (fair; sometimes fails to meet the required level) in two of the competency categories (self-management and work record/reliability). However, Lueckenotte recommended that Nofles be retained after the reorganization.
Lueckenotte met with Nofles to review her ESG and competency ratings. Although Nofles disagreed with his ratings, Lueckenotte declined to change his evaluation. Nofles thereafter drafted a written response protesting Lueckenotte's competency ratings, which was attached to her ESG.[5] Based upon her low competency ratings in her ESG, Nofles was not offered a position as a field claim representative in any of the St. Louis offices. Instead, she was notified on November 2, 1996, that she had been placed on the Transition Staff. Nofles was also informed that she would be terminated on January 23, 1998 if she *811 could not find another position in the company by that date.
Nofles appealed the decision to place her on the Transition Staff in December of 1996, alleging that she was placed on the team because she could not move to Columbia, Missouri and work swing shifts as a result of her fibromyalgia. State Farm assigned Eddie Sermons, an African-American section manager, to review the merits of Nofles' appeal. After meeting with Lueckenotte, Sermons concluded that Nofles should remain on the Transition Staff. Sermons and Nofles' current supervisor told Nofles that her appeal was denied on January 29, 1997.
Nofles never returned to work after her appeal was denied. Instead, she took off work on January 30, 1997 as a paid vacation day. The next day, Nofles notified State Farm that her physician had diagnosed her with a form of exhaustion requiring her to be absent from work for two weeks. Nofles was told that she would need to complete some paperwork to request an extended absence and that her leave would be on a non-paid basis until State Farm received sufficient information from her physician to document the medical necessity of her leave.
According to State Farm's personal illness policy, "[p]aid sick leave is provided only when [an employee] [is] physically or mentally unable to work because of illness or accident, including pregnancy." The personal illness policy distinguishes paid sick leave from medical leave, which State Farm defines as "unpaid leave [] unrelated to the employee's length of service or enrollment in the Long Term Disability Plan." The policy further provides that "[m]edical [l]eave will be granted only when management has, in its judgment, adequate medical information supporting continuing disability."
State Farm employs a medical department which is supervised by Human Resources and consists of two occupational health nurses and a medical doctor, Dr. Donald Delwood. The medical department reviews employee requests for leave due to medical conditions to ensure that adequate documentation substantiates an employee's claimed inability to work because of illness or accident. Dr. Delwood also serves as an intermediary between State Farm's administration and medical department and advises State Farm if the medical documentation supplied by employees is adequate to substantiate the employee's absence.
Whenever an employee is on paid sick leave in excess of five days, it is considered an extended absence and a long-term illness kit is sent to the employee. A long-term illness kit consists of a medical certification form to be completed by the employee's treating physician, a release of medical records and a medical data form to be completed by the employee. State Farm's Human Resource Manager's Guide to Paid Sick Leave states that "for extended absences, human resources should contact the medical department to consider direct intervention and case management. Medical may request authorizations and medical records from the employee or the employee's doctor." With respect to medical documentation, the guide states that "employees requested to provide medical documentation to substantiate an illness or injury should be given 15 calendar days to do so ... Continued failure to produce the necessary medical documentation may warrant a recommendation for termination." Neither the personal injury policy nor the human resource guide expressly permit State Farm to request the employee to undergo an independent medical examination to substantiate the need for medical leave. Instead, the guide merely states that "the medical department may require a limited physical examination or additional medical information to assess an employee's fitness to return to duty. Furthermore, a doctor's approval to return to work may be necessary."
On February 3, 1997, Nofles' treating psychiatrist Dr. Farida Farzana completed *812 State Farm's medical certification form on her behalf. Dr. Farzana noted that Nofles was diagnosed with major depression, chronic fatigue syndrome and rheumatoid arthritis. Dr. Farzana also indicted that Nofles' disability began on January 17, 1997 and that she could not return to work until February 17, 1998. After receiving this medical certification, State Farm began Nofles' paid sick leave benefits effective January 31, 1997.
After reviewing Dr. Farzana's certification, Dr. Delwood contacted Dr. Farzana to inquire whether Nofles' return-to-work date of February 17, 1998 was a typographical error. Dr. Farzana confirmed that she had in fact authorized Nofles' thirteen-month absence from work. Her proffered explanation for this lengthy absence is disputed. According to Dr. Delwood, Dr. Farzana stated that she authorized thirteen months leave for Nofles not for medical reasons, but to prevent State Farm from constantly barraging her with paperwork. Dr. Farzana's deposition testimony, however, reveals a contrary explanation for the diagnosis[6]:
Q: And then the next line says return to work date.
A: Uh-huh. That's because every job asks me approximately by what time the patient is able to return to work.
Q: Right.
A: So I write an approximate time that she is able to return to work.
Q: And this one you put February 17th of
A: Yeah, because.
Q:  of 1998?
A: Right.
Q: Thirteen months.
A: Right. Because I do not want to get headaches all the time, them sending me all these papers all over again telling me to do this and that. So, you know, if she was chronically severely depressed and her condition is deteriorating, it is not improving no matter what I try, no matter what any other person is trying, and progressively she is getting into accidents, she is not sleeping, and she is having suicidal ideations, so she is totally unable to work.
So, I know that she is not going to work. She is not able to work. So, where is the sense in writing one month? Then they send me another bunch of papers to fill out. And that's the same old story. She is not able to function. She is telling me that she is having accidents and suicidal and I'm shuffling with her medicine all over the place and she is going through a lot of stress because her mother was also having cancer and she was taking care of the mother at home telling me about her too. Yeah, now I remember that.
Q: Okay. My question is how did you make the determination?
A: That's how I do. I do write one year to a lot of the patients who are chronically depressed and unable to function, then we have to put a date and I write one year. Within that one year they may be able to go to work, they may not be able to go to work. But that's an assumed date that we can write.
Q: And if I understood you correctly, you write the date in there a year in advance 
A: Yeah.
Q:  so that the company doesn't keep asking you to fill these forms out every month or every other month?

*813 A: Yeah, and also the severity of the illness of the patient. If she is just going down the hill she is not going to improve. She is not going to improve in one month or two months. She is steadily going down the hill ...
Q: Did you have some actual belief that she would not be able to return to work before February 17th of 1998?
State Farm failed to provide the Court with Dr. Farzana's answer to this last deposition question.
After his conversation with Dr. Farzana, Dr. Delwood doubted the propriety of her recommendation that Nofles have a thirteen-month leave of absence from work. Accordingly, Dr. Delwood decided to require Nofles to submit to a medical evaluation by a second psychiatrist, Dr. Wayne Stillings. Dr. Delwood informed Nofles that he was requesting that she be examined by Dr. Stillings because he did not see a justification for her extended absence from work.
Nofles initially agreed to the examination by Dr. Stillings, but then failed to appear as scheduled. State Farm's medical department then contacted Nofles by telephone and informed her "that State Farm wanted her to undergo an independent medical examination with Dr. Stillings to obtain a reasonable explanation for plaintiff's leave of thirteen months." During that conversation, Nofles informed the medical department that she had scheduled an appointment with her family physician and would ask him to provide additional information to State Farm. Despite Nofles' offer, State Farm's medical department continued to insist that Nofles be examined by Dr. Stillings.
State Farm then rescheduled Nofles' appointment with Dr. Stillings, but she again refused to appear. Accordingly, on March 25, 1997, State Farm changed Nofles' leave from paid sick leave to a leave of absence without pay for failing to provide adequate information to substantiate her current medical leave and to cooperate in State Farm's efforts to obtain appropriate documentation. Nofles was also warned in writing that if she failed to keep her rescheduled April 11, 1997 appointment with Dr. Stillings, then she would be terminated.
On April 10, 1997, Nofles, through counsel, advised State Farm in writing that she objected to Dr. Stillings as an independent medical examiner and indicated that she would not appear for her scheduled appointment. In this letter, however, Nofles indicated that she would be willing to undergo a medical examination if performed by another doctor.
Nofles was examined by her family physician, Dr. Harvey Walker, on April 11, 1997. Dr. Walker also completed a medical certification form for Nofles indicating that Nofles was diagnosed with chronic fatigue syndrome, major depression and fibromyalgia. Like Dr. Farzana, Dr. Walker also authorized a thirteen-month leave of absence for Nofles. Nofles forwarded a copy of Dr. Walker's medical certification form to State Farm on April 16, 1997. On that same date, State Farm changed its referral request from Dr. Stillings to another psychiatrist, Dr. Paul Packman. Nofles was subsequently advised by letter that her failure to attend the examination by Dr. Packman on May 20, 1997 would result in the termination of her employment by State Farm.
State Farm terminated Nofles' employment on May 20, 1997 after she failed to attend her scheduled appointment with Dr. Packman. Nofles' termination letter dated May 21, 1997 states that the decision to discharge her "is based upon [her] failure to provide adequate documentation supporting the need for medical-related leave, and [her] failure to cooperate in State Farm's efforts to obtain such documentation." Nofles claims that she was required to submit to an independent medical examination and terminated on the basis of race and/or gender discrimination.
Nofles filed a charge of discrimination with the EEOC on March 12, 1998 and *814 received a right-to-sue letter on May 26, 1998. Nofles thereafter filed the instant action on August 12, 1998. Count I alleges Nofles was treated disparately and that State Farm failed to reasonably accommodate her disabilities in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. Count II alleges race, gender and retaliation discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Count III alleges racial discrimination in violation of 42 U.S.C. § 1981. Nofles seeks reinstatement, back pay, front pay, as well as compensatory and punitive damages.

II. Discussion

In determining whether summary judgment should issue, the Court views the facts and inferences from the facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in its pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323, 106 S.Ct. 2548. Finally, in making this determination, the Court is mindful of the Eighth Circuit Court of Appeal's admonition that "summary judgment should seldom be granted in discrimination cases." Bassett v. City of Minneapolis, 211 F.3d 1097, 1099 (8th Cir.2000).

A. Statute of Limitations for Title VII and ADA Claims
State Farm first contends that Nofles' discrimination claims prior to May 16, 1997 are untimely. The enforcement provisions of Title VII require a complainant to file an administrative charge within three hundred (300) days "after the alleged unlawful employment practice occurred when the charging party has initially instituted proceedings in a state human rights agency." 42 U.S.C. § 2000e-5(e)(1). The ADA incorporates Title VII's 300-day statute of limitations. 42 U.S.C. § 12117 (1994). "The statute of limitations begins to run at the time of the discriminatory act, and not when the consequences of the act become most painful." Conner v. Reckitt & Colman, Inc., 84 F.3d 1100, 1102 (8th Cir.1996).
A plaintiff generally cannot recover for discriminatory conduct occurring outside the limitations period. See Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 572 (8th Cir.1997). Despite the statute of limitations, "[e]vidence of incidents occurring outside the limitations period may still be admissible. One instance is when the incidents are part of a continuing violation." Id. To establish a continuing violation, "a plaintiff must show that the acts of which he or she complains were not actionable as discrete violations of the applicable law." Stolzenburg v. Ford Motor Co., 143 F.3d 402, 405 (8th Cir.1998). Moreover, a plaintiff must also prove that the violation continued into the limitations period. Gipson v. KAS Snacktime Co., 171 F.3d 574, 579 (8th Cir.1999). "[A]n isolated event, even one with continuing impact, does not constitute a continuing violation." Herrero v. St. Louis University Hosp., 109 F.3d 481, 486 (8th Cir.1997).
To determine whether a series of acts actually constitutes a continuing violation, other district courts in this circuit have applied the Fifth Circuit Court of Appeal's analysis in Berry v. Board of Sup'rs of L.S.U., 715 F.2d 971 (5th Cir. *815 1983), which sets forth the following factors to consider: 1) subject matter  the relationship of the acts to each other; 2) permanence  whether the nature of the alleged violations should have "triggered an employee's awareness of the need to assert his rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate"; and 3) frequency  whether the alleged acts are reoccurring or "more in the nature of an isolated employment decision." Id. at 1415; see also, Hill v. St. Louis University, 923 F.Supp. 1199, 1206 (E.D.Mo.1996); Jenkins v. Wal-Mart Stores, Inc., 910 F.Supp. 1399, 1415 (N.D.Iowa 1995).
Finally, "even if a plaintiff is unable to show a continuing violation, instances of harassment occurring outside the limitations period may be admissible to provide relevant background to later discriminatory acts." Kline v. City of Kansas City, Missouri Fire Dept., 175 F.3d 660, 665 (8th Cir.1999) (internal quotations omitted). "In this circuit, though, damages may not be predicated on events that occur prior to the limitations period." Id. at 666.
Because Nofles filed her EEOC charge of discrimination on March 12, 1998, any discriminatory conduct occurring before May 16, 1997 is not actionable in this case unless as part of a continuing violation. See Gipson, 171 F.3d at 579. In this case, all of the alleged discriminatory conduct except Nofles' discharge took place outside the limitations period. Nofles admits that she was not disabled under the ADA after January 29, 1997 (and therefore within the limitations period).[7] Because Nofles cannot recover under the ADA unless she is disabled, no actionable disability discrimination occurred within the limitations period. For this reason, the alleged disability discrimination that occurred prior to May 16, 1997, cannot constitute part of a continuing violation for which a timely charge of discrimination was filed. See id. Accordingly, her ADA claims are barred by the statute of limitations.
Nor does the pre-limitation conduct amount to a continuing violation culminating in Nofles' discharge. First, the comments and actions of Nofles' co-workers are not adverse employment actions that could constitute part of Nofles' disparate treatment claim arising out of her discharge. These actions could, at most, only constitute part of a harassment claim, which has not been alleged by Nofles in this case.[8] Accordingly, this alleged conduct is "merely an unfortunate event in history which has no legal consequences." United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).
Nofles also alleges that the following actions amounted to a continuing violation of her disparate treatment claim: 1) denial of her requests to work part time and in the drive-in department, 2) unwarranted discipline and treatment by Lueckenotte; and 3) denials of her appeal and her placement on the Transition Staff in late 1996. Applying the Berry factors, the Court finds that each of these acts are discrete events that constituted completed actions at the time they occurred. The denials of Nofles' requests for different hours and department transfers occurred in different years and were final personnel decisions at the time they were made. As such, they do not amount to a continuing violation. See Kline, 175 F.3d at 665.
*816 Similarly, Nofles' placement on the Transition Staff (which the parties have appropriately characterized as a reduction-in-force claim), was an isolated employment decision that affected not only Nofles, but other employees as well. It was an act distinct and independent of the decision to terminate Nofles in 1997 for her failure to substantiate her need for medical leave. This employment decision is similar to a denied promotion or demotion, which are characterized as discrete events, see Herrero, 109 F.3d at 486, and triggered a duty of the Nofles to assert her rights. Moreover, Nofles testified in her deposition that she and another co-worker believed at the time that her placement on the Transition Staff was discriminatory; yet, she did nothing to assert her rights in a timely fashion. Because she did not file a timely charge of discrimination based upon her assignment to the Transition Staff, this claim is time-barred.
The same analysis applies to the denial of Nofles' appeals. These claims arise from Lueckenotte's refusal to amend his evaluation of Nofles in her ESG and State Farm's subsequent denial of her appeal regarding her placement on the Transition Staff. Both of these employment decisions were final, discrete acts at the time they occurred and do not constitute a continuing violation. Since Nofles failed to file a timely charge of discrimination based upon the denial of her appeals, these claims are time-barred.
Although the Court finds that Nofles cannot recover for these disparate treatment claims as outside the statute of limitations, it notes that at least some of these events could presumably "be admissible to provide relevant background to later discriminatory acts." Id. The Court declines to make any evidentiary rulings at this time, however, and will instead reserve any rulings on this issue until raised at trial or in properly filed motions in limine.
As for Nofles' complaints of unwarranted discipline and comments by Lueckenotte, the Court also finds that these claims are not part of a continuing violation. Although these acts allegedly happened with greater frequency than the other events discussed above, there is still no evidence that they are related to Nofles' termination. In fact, it is undisputed that Lueckenotte was no longer Nofles' supervisor when she was denied medical leave and was not involved in the decision to terminate Nofles. None of Lueckenotte's alleged derogatory comments were made in connection with Nofles' termination and therefore do not constitute evidence of an impermissible motive in connection with the decision to discharge Nofles. See Herrero, 109 F.3d at 484. Because there is no evidence that these acts outside the limitations period constitute part of Nofles' disparate treatment claim, they are time-barred.
Nofles' retaliation claims are also barred by the statute of limitations. Nofles claims that she was subjected to retaliatory discrimination after speaking to an attorney who represented a former State Farm employee in a discrimination suit and refusing to verify whether a co-worker abused drugs. These events and the alleged resulting retaliatory conduct occurred well outside the limitations period. The Court finds that these actions constitute discrete events that do not amount to a continuing violation. Accordingly, the Court will grant judgment as a matter of law in favor of State Farm on Nofles' retaliation claims.[9]

*817 B. Nofles' Discriminatory Discharge Claim
Nofles also alleges that her discharge was motivated by racial and/or gender animus. Because there is no direct evidence of discriminatory intent, the Court will analyze Nofles' discrimination claim using the analytical framework of burden shifting developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). See Roxas v. Presentation College, 90 F.3d 310, 315 (8th Cir.1996)(applying McDonnell Douglas elements to plaintiff's Title VII, ADEA, and § 1981 claims). Under this framework, a plaintiff must first establish a prima facie case of discrimination by adducing proof: (1) that plaintiff is a member of a protected class; (2) that plaintiff was qualified for the job for which she was hired; (3) that plaintiff was discharged; and (4) that the circumstances surrounding the discharge create an inference of unlawful discrimination. Burdine, 450 U.S. at 253 n. 6, 101 S.Ct. 1089.; see also Lidge-Myrtil v. Deere & Co., 49 F.3d 1308, 1310 (8th Cir.1995); Berg v. Bruce, 112 F.3d 322, 327 (8th Cir.1997). The prima facie case creates a rebuttable presumption of discrimination. Burdine, 450 U.S. at 254, 101 S.Ct. 1089.
Once the plaintiff has created this rebuttable presumption, the defendant must advance a legitimate, non-discriminatory reason for the termination. St. Mary's Honor Center, 509 U.S. at 506-08, 113 S.Ct. 2742. Defendant's burden is one of production  not proof. Burdine, 450 U.S. at 254-55, 101 S.Ct. 1089; Krenik v. County of Le Sueur, 47 F.3d 953, 958 (8th Cir.1995). The defendant need not persuade the court; rather, it must simply provide some evidence of a nondiscriminatory reason or reasons for its action. St. Mary's Honor Center, 509 U.S. at 509, 113 S.Ct. 2742.
Upon the proffer of such evidence, the plaintiff then has the opportunity to show that the employer's purported reasons for the termination were merely a pretext for discrimination. Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1332 (8th Cir.1996). Plaintiff may either prove pretext directly, by showing that her employer was more likely motivated by a discriminatory reason, or indirectly, by showing that her employer's explanation is unworthy of credence. Rose-Maston v. NME Hospitals, Inc., 133 F.3d 1104, 1108 (8th Cir.1998). However, a showing of pretext may not necessarily be enough. The factfinder's rejection of the defendant's proffered nondiscriminatory reasons permits, but does not compel, the inference of the ultimate fact of intentional discrimination. St. Mary's Honor Center, 509 U.S. at 511, 113 S.Ct. 2742. The plaintiff at all times bears the ultimate burden of establishing the existence of facts which if proven at trial would permit a jury to conclude that intentional discrimination was the true reason for the defendant's action. Id. at 507-08, 113 S.Ct. 2742. A plaintiff may prove a disparate treatment claim by showing that she was "similarly situated in all relevant respects" to a non-member of the protected class who was *818 more favorably treated. Smith v. Monsanto Chemical Co., 770 F.2d 719, 723 (8th Cir.1985), cert. denied, 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986).
In its motion for summary judgment, State Farm only argues that its requests for Nofles to undergo medical examinations and her subsequent termination for her refusal to do so do not violate the ADA. Although Nofles contends that these actions "are clearly proscribed by the ADA," she offers no legal authority to support this assertion. Moreover, as discussed earlier, any ADA claims based upon these acts  all of which occurred after January 29, 1997  are barred by Nofles' admission that she was not "disabled" under the ADA after January 29, 1997. However, Nofles also alleges in her second amended complaint and in opposition to summary judgment that her termination was motivated by racial and/or gender animus. In support of this assertion, Nofles named other white and/or male State Farm employees who had requested extended absences from work due to medical conditions and had not been required to submit to independent medical examinations to substantiate their requests for leave.
In its reply brief in support of summary judgment, State Farm does not dispute that Nofles established a prima facie case of race and/or gender discrimination in connection with her termination. Instead, it contends that State Farm had a legitimate, non-discriminatory reason for discharging Nofles, namely, that she failed to provide adequate medical documentation justifying her need for a thirteen-month absence from work. State Farm further alleges that it had a legitimate, non-discriminatory reason for requesting a medical examination of Nofles, which was "to determine her ability to perform her job."
This issue has been made unnecessarily complicated by the lack of clarity in the second amended complaint and Nofles' failure to appropriately respond to the summary judgment motion by citations to evidence in the record. Nevertheless, the Court's own review of the entire record in this case convinces it that a genuine issue of material fact precludes summary judgment on Nofles' discriminatory discharge claim. Because State Farm concedes that Nofles has established a prima facie case of racial and/or gender discrimination in connection with her termination, the burden then shifts to State Farm to articulate a legitimate, non-discriminatory reason for Nofles' termination. State Farm has met this burden by claiming that Nofles was terminated for failing to provide adequate medical documentation supporting her extended absence.
The question then becomes whether Nofles has come forward with evidence of pretext showing that the reason articulated by State Farm is not the real reason for her discharge. See Bassett, 211 F.3d at 1107. Taking Nofles' evidence as true and drawing all inferences in her favor, there is sufficient evidence in the record to permit a jury to conclude that State Farm's stated reason for Nofles' termination was merely a pretext for intentional discrimination. Although Nofles presented completed medical certification forms from two of her treating physicians to substantiate her need for a thirteen-month leave of absence, State Farm nevertheless terminated her for failing to submit to a third medical examination by a doctor of its choosing. Although State Farm claims that its sick leave policy vests it with the authority to require such an examination, none of the documents submitted by State Farm in support of this assertion expressly provide that an employee requesting extended medical leave may be required to undergo an independent medical examination. The Court also notes that, even if the sick leave policy vested such discretion within State Farm, it could not exercise that discretion in a discriminatory fashion.
As further evidence of pretext, Nofles testified that other white and/or male employees of State Farm who requested extended medical leave were not required to *819 undergo an independent medical examination to substantiate the need for leave. State Farm asserts that these other employees are not similarly situated to Nofles, but this argument fails for two reasons. First, State Farm only attempts to distinguish Nofles from one of the employees, Mike Montileone, mentioned in her deposition. Thus, Nofles has presented unrefuted testimony (which must be taken as true for summary judgment purposes) that other white and/or male employees were not required to undergo medical examinations before their extended medical leave was approved. Second, State Farm's attempt to distinguish Montileone from Nofles is not persuasive. State Farm contends that Montileone was not required to undergo an independent medical examination before his medical leave was approved because "it was State Farm's position that [Montileone's] medical records, indicating paralyzation and inability to communicate, were sufficient documentation for the requested medical leave ...." State Farm appears to be contending that Montileone and Nofles are not similarly situated because Montileone's medical condition and physicians are more "believable" than Nofles'. State Farm's reliance upon subjective criteria such as credibility determinations to explain its employment decision may be "particularly easy for an employer to invent in an effort to sabotage a plaintiff's prima facie case and mask discrimination." McCullough v. Real Foods, Inc., 140 F.3d 1123, 1129 (8th Cir.1998).
Under these circumstances and when considered in conjunction with the background evidence of disparate treatment in the record, the Court finds that Nofles has demonstrated evidence of pretext for discrimination and raises a question as to whether her discharge was based upon racial and/or gender discrimination. See Bassett, 211 F.3d at 1109. This genuine dispute of material fact should only be decided by a jury making important credibility determinations. Id. Summary judgment on Nofles' discriminatory discharge claim is therefore denied.

C. Section 1981 Claim
Nofles also contends that State Farm violated 42 U.S.C. § 1981 by engaging in unlawful employment practices because of her race. State Farm contends that it is entitled to judgment as a matter of law on Nofles' § 1981 claim because she was an employee-at-will and therefore did not have an employment contract subject to protection under the statute. Nofles responds that State Farm's employee handbook created an employment contract between the parties.
Section 1981 provides in pertinent part:
(a) Statement of equal rights
All persons...shall have the same right...to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property enjoyed by white citizens...
42 U.S.C. § 1981(a). Congress amended the act in 1991 and defined the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Section 1981 is applicable to contracts of employment. See Jones v. Becker Group of O'Fallon, 38 F.Supp.2d 793 (E.D.Mo.1999).
At issue in this case is whether Nofles, an "at will" employee, had a contract of employment with State Farm subject to protection under § 1981. Whether "at will" employees are protected under § 1981 has yet not been addressed by the United States Court of Appeals for the Eighth Circuit. Courts which have addressed the question are split. Jones, 38 F.Supp.2d at 796 (internal citations omitted).
Nofles' employment relationship with State Farm is governed by Missouri *820 law. See, Jones supra. Under Missouri law, an employee is considered to be "at will" unless she is subject to a contract setting the duration of her employment or delineating the reasons for which she can be fired. Paul v. Farmland Industries, Inc., 37 F.3d 1274, 1277 (8th Cir.1994), cert. denied, 514 U.S. 1017, 115 S.Ct. 1360, 131 L.Ed.2d 217 (1995). "At will" employees can be terminated at any time without cause or reason. Id. The Missouri Supreme Court has held that an employee may not maintain a contract action when she is terminated unless she can show that she was subject to an employment contract, an essential element of which is a set duration of employment. Luethans v. Washington University, 894 S.W.2d 169, 172 (Mo. banc 1995). This is not to say that "at will" employees in Missouri have no recourse when they are terminated. Boyle v. Vista Eyewear, Inc., 700 S.W.2d 859 (Mo.Ct.App.1985). If an "at will" employee is terminated in violation of a specific statutory provision or in violation of public policy, the employee may sue for wrongful discharge. Id. A wrongful discharge suit is not contractual in nature; instead, it sounds in tort. Id. at 878.
Under Missouri law, "at will" employees do not have contractual rights enforceable in the event of termination. Section 1981 claims depend upon the existence of such contractual rights. Jones, 38 F.Supp.2d at 796. Nofles has presented no evidence demonstrating that the provisions of State Farm's employee handbook governing sick leave (the only portions of State Farm's handbook provided to the Court) guarantee Nofles a specified duration of employment. Instead, the undisputed evidence demonstrates that it did not. Because Nofles was an "at will" employee, she did not have any contractual rights with regard to her continued employment at State Farm. Consequently, her termination did not affect her ability to contract under § 1981 and she cannot maintain a claim under that statute as a matter of law.

D. Back Pay Claim
Finally, State Farm moves for partial summary judgment to limit any potential award of back pay. State Farm contends that Nofles would not be entitled to back pay for any period after January 29, 1997 (except for paid sick leave from March 25, 1997 through July 21, 1997) because she admitted that she has been unable to work after that date. Nofles does not dispute that she cannot recover back pay for this time period. Because the Court agrees that a plaintiff cannot recover back pay for the period of time that she would have been unable to work due to a disability, see E.E.O.C. v. Independent Stave Co., 754 F.Supp. 713 (E.D.Mo.1991), the Court will grant State Farm's motion for partial summary judgment on damages.
Accordingly,
IT IS HEREBY ORDERED that defendant's motion for summary judgment [# 56] is granted in part and denied in part as set forth above.
IT IS FURTHER ORDERED that defendant shall have summary judgment on Counts I and III of plaintiff's second amended complaint, and Counts I and III of plaintiff's second amended complaint are hereby dismissed with prejudice.
IT IS FURTHER ORDERED that defendant's motion for partial summary judgment [# 57] is granted.
NOTES
[1] The Court notes that Nofles failed to point to any material, controverted facts precluding summary judgment despite being granted leave to file an opposition to State Farm's motion for summary judgment out of time.
[2] The Court finds these facts as undisputed for summary judgment purposes only. This opinion does not relieve either party from the obligation to prove all facts essential to the presentation of their claims or defenses at trial.
[3] The Court is unable to pinpoint the exact date because State Farm failed to provide the Court with the cited page of Nofles' deposition where she apparently testifies about informing State Farm of her disability.
[4] "Fibromyalgia is muscle pain in fibrous tissues. Stedman's Medical Dictionary 222 (4th ed.1976). It is a degenerative disease which results in symptoms such as achiness, stiffness, and chronic joint pain." Kelley v. Callahan, 133 F.3d 583, 585 n. 2 (8th Cir.1998).
[5] Nofles' letter states in part:

There has [sic] been disagreements with my supervisor ever since he was sued. But I believe we both felt we were professional enough to do our job and remain in the same unit. Unfortunately as one claim rep. remarked, "Larry, has his foot on your neck." This of course makes for a difficult work situation. I did try to resolve this first with him, then with personnel and finally by requesting a unit transfer.
The only problem was that my supervisor fought to keep me in his unit. I do believe that if the job I was doing was lacking he would have looked for and created reasons for termination.
I do not believe I am "super adjuster"  but this rating was too low and does not give an adequate picture of my abilities.
[6] State Farm provided the Court only with selected portions of Dr. Farzana's deposition testimony. In particular, State Farm omitted testimony relevant to Dr. Farzana's explanation of her diagnosis. Even with the carefully edited deposition transcript, however, it is apparent to the Court that State Farm has mischaracterized Dr. Farzana's testimony in an attempt to disguise a genuine dispute of material fact. The Court strongly disapproves of this tactic, which is compounded by Nofles' failure to provide the omitted portions of Dr. Farzana's testimony in opposition to summary judgment.
[7] From a review of the second amended complaint, it is unclear whether Nofles actually pleaded that her discharge violated the ADA. However, in her opposition to summary judgment, Nofles concedes that she was not disabled under the ADA after January 29, 1997.
[8] Even if Nofles had stated a harassment claim, however, she would still fail to establish a continuing violation entitling her to recover for alleged conduct outside the limitations period because the comments are too sporadic and remote in time from Nofles' discharge. See Gipson, 171 F.3d at 580.
[9] The Court also notes that, even if not time-barred, these claims would nevertheless fail as a matter of law because Nofles has wholly failed to establish that she suffered any adverse employment actions as a result of the alleged retaliatory conduct. See Herrero, 109 F.3d at 485. Although Nofles contends that her relationship with Lueckenotte was strained after her conversation with the attorney, this discomfort does not constitute an adverse employment action under Title VII. See Hoffman v. Rubin, 193 F.3d 959, 964 (8th Cir.1999) ("We acknowledge plaintiff's contention that personnel and conditions in the Chicago office would be hostile to him. Such considerations, while hardly negligible on a personal level, are not concrete enough to trigger a Title VII claim.").

As for Nofles' second retaliation claim, the Court does not find any legal support for her contention that refusing to report whether a co-worker is abusing drugs constitutes "protected activity" within the meaning of Title VII. To the extent Nofles is attempting to argue that State Farm pressured her to falsify allegations of drug abuse by a co-worker, she has still failed to point to any adverse employment action taken against her as a result of this alleged protected activity. Instead, she merely speculates that she did not receive expected pay increases. However, Nofles offers no evidence to support a causal connection between her alleged refusal to discriminate against a co-worker and the absence of salary increases. Her rank speculation is insufficient to create a genuine issue of material fact to preclude summary judgment on this issue.