**Percy HOGAN, Plaintiff,**

**v.**

**William J. HENDERSON, in his official capacity as Postmaster General of the United States;[1] Simon M. Molina; the Attorney General of the United States; the United States Attorney for the District of Arizona; the United States Post Office, Defendants.**

**No. CivA 96–1189–PHX–ROS.**

United States District Court,
D. Arizona.

June 20, 2000.

---

1. Hogan initially brought suit against former Postmaster General Marvin T. Runyon. Pursuant to Fed.R.Civ.P. 25(d)(1), Runyon's successor, William J. Henderson, has been substituted to represent the Postal Service in his official capacity. *See Jordan v. Henderson,* No. C–97–3810–VRW, 1998 WL 427415, at *1 (N.D.Cal.1998) (substituting Henderson following Runyon's resignation).

Percy J. Hogan, Sewickley, PA, pro se.

John Robert Mayfield, U.S. Attorney's Office, Phoenix, AZ, for Defendants.

## MEMORANDUM AND ORDER

YOUNG, District Judge.[2]

Acting *pro se*, the plaintiff Percy Hogan ("Hogan"), a former employee of the United States Postal Service, brings this suit against various defendants alleging racial discrimination and seeking back pay, monetary damages, and declaratory and injunctive relief due to alleged violations of Title VII, 42 U.S.C. § 1983, and a pendant state law claim for infliction of emotional distress. In light of prior rulings,[3] what now remains of his second amended complaint is a Title VII action pursuant to 42 U.S.C. § 2000e–16 against Postmaster General William J. Henderson ("Henderson"). Now, firing a second barrage of motions, Henderson seeks to halt Hogan's advance before the Court actually examines the evidence in the case.

## II. *Factual Background*

For the purposes of these motions the alleged facts are taken primarily from Hogan's complaint. Hogan is an African-American who worked at a postal facility in Rio Salado, Arizona. *See* Second Am. Compl. ¶¶ 2, 6. Hogan worked intermittently from November 30, 1992 through June 29, 1994 as a "casual" employee. *See id.* ¶ 6. A casual employee cannot be employed in lieu of full or part time employees, but is hired as a supplemental worker for as long as two 90–day terms of employment per year. *See id.* Of the approximately twenty employees on Hogan's shift,

only two were African–American. *See id.* ¶ 7. During the course of his employment at Rio Salado, Hogan received highly favorable recommendations from his supervisors and was rehired five separate times. *See id.* ¶ 8. Hogan alleges that he never missed a day of work, was always respectful of his supervisor and coworkers, and consistently performed his duties in a "more than satisfactory manner." Second Am.Compl. ¶ 9. Hogan claims that the supervisors would often call him—and not the Hispanic employees—at home on his days off and request that he report to the facility in order to work overtime. *See id.* ¶ 10. Molina became Hogan's direct supervisor in September or October of 1993 and, according to Hogan, racial discrimination began. *See id.* ¶¶ 12, 13. In late October 1993, Molina called Hogan into his office and accused Hogan of conspiring to slow down the work flow so that extra overtime hours could be earned. *See id.* ¶ 14. Hogan alleges that Molina made this false accusation on the basis of Hogan's race and that it caused Hogan much anxiety and distress. *See id.* ¶ 17. Hogan alleges that another African–American employee was accused of the same conduct that day, while similarly situated white and Hispanic employees were not subjected to this harassment. *See* Second Am.Compl. ¶ 18. Under Molina's supervision, Hispanic workers were routinely given time off, while Hogan and other non-Hispanic workers were not provided these benefits. *See id.* ¶ 21. Furthermore, Hogan was always the first to be assigned to do the menial tasks while Hispanic employees were rarely asked to do these tasks. *See id.* ¶ 23. In addition, Molina rarely spoke to Hogan, while Molina frequently chatted with the Hispanic workers in Spanish. *See id.* ¶ 25.

---

2. Of the District of Massachusetts, sitting by designation.

3. In an Order filed on February 11, 1999, Judge Rosyln O. Silver granted the defendants' motion to dismiss [docket no. 44–1], and dismissed the following defendants: Simon M. Molina, the Attorney General for the United States, the United States Attorney for the District of Arizona, and the United States Post Office. Judge Silver also granted an additional motion to dismiss [docket no. 44–2] submitted on behalf of the defendants which disposed of the 42 U.S.C. § 1983 claim, the state tort claim, as well as the claim for punitive damages.

On May 27, 1994, when the Veterans Readjustment Appointment ("VRA") program posting for career city letter carriers was released, Hogan alleges that he was the best qualified candidate to become a regular postal employee. *See* Second Am. Compl. ¶ 27. Unlike his coworkers, Hogan passed the postal exam, was a four-year (1964–1968) veteran of the Air Force, and met all the qualifications specified for the position. *See id.* Molina directed Hogan to apply for the position and submit Molina's favorable recommendation, which was dated January 11, 1994. *See id.* ¶ 28. In May 1994, Hogan applied for the permanent city letter carrier position. *See id.* ¶ 29. On June 29, 1994, Hogan's temporary casual employment term expired and his term was not renewed. *See id.* ¶ 30. On July 22, 1994, Hogan inadvertently learned that Molina had made a subsequent negative recommendation, which described Hogan's performance as marginal and explained that Hogan frequently left his work station without authorization and required constant supervision. *See* Second Am.Compl. ¶¶ 31, 32. Hogan alleges that his requests to be renewed as a casual employee or to be hired as a career city letter carrier were rejected because of Molina's intentionally false recommendation. *See id.* ¶¶ 30, 31, 32. Hogan specifically alleges that the reasons provided by Molina for the failure to rehire Hogan "were a pretext to unlawful racial discrimination." *Id.* ¶ 34.

### III. *Standard of Review*

Pursuant to Fed.R.Civ.P. 56(c), summary judgment ought be granted where there is no genuine issue of material fact and the movant is entitled to judgment as matter of law. The moving party has the burden of establishing both the lack of any genuine issue of material fact and its entitlement to judgment, and the inferences drawn from the underlying facts must be taken in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party may discharge its burden by showing that there is an absence of evidence to support the nonmoving party's case. *See Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548. The party opposing a motion for summary judgment may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial, *Anderson,* 477 U.S. at 248, 250, 106 S.Ct. 2505, or significant probative evidence tending to support his claim or defense. *See Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir.1987). The mere existence of any factual dispute will not defeat a summary judgment motion, for the requirement is that there be a genuine dispute about a material fact. *See Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. A fact is "material" if it is critical to, or might affect, the outcome of the suit under the governing law. *See id.* These general principles of summary judgment practice apply with equal force in the employment discrimination context, but since intent is often disputed in such cases, courts treat summary judgment motions in employment discrimination cases with some caution. *See Sischo–Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1111 (9th Cir.1991). Nonetheless, summary judgment may be appropriate for discrimination claims when the plaintiff does nothing more than present conclusory allegations. *See Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 890 (9th Cir.1994) (summary judgment appropriate, after showing of a "bare prima facie case," where evidence to refute defendant's legitimate explanation was "totally lacking").

### IV. *Discussion*

#### A. *The Motion in Limine*

Henderson moves to preclude Hogan from attempting to introduce testimony,

documents, exhibits, or other evidence which address or prove allegations or issues beyond the scope of his administrative complaint. Henderson claims that after Hogan's administrative complaint was accepted for investigation, a letter was sent to him which limited the scope of the claims that would be investigated to the allegation that he was denied a permanent letter carrier position on account of his race. *See* Def.'s Mem. in Support of Mot. In Limine at 2, Ex. A. This letter also advised Hogan that if he had any disagreement with the defined issues, he should communicate those objections in writing to the Equal Employment Opportunity ("EEO") office.[4] *See id.* Because Hogan never responded, Henderson argues that the only claim for which Hogan has exhausted his administrative remedies is that he was "[d]enied employment as a career City Letter Carrier." *Id.* Hogan responds that "[t]he truth is that plaintiff's administrative complaint contains every allegation that has been included in this lawsuit," Pl.'s Reply to Defs.' Mot. In Limine at 1, and argues that because his duty is merely to complain to the administrative agency and that he has discharged this duty, he has satisfied the exhaustion requirement. The issue, however, is far more complicated than either of the parties suggest.

■ A Title VII claimant must exhaust administrative remedies before seeking judicial relief from discriminatory action. *See Sloan v. West,* 140 F.3d 1255, 1259 (9th Cir.1998). The Ninth Circuit has elucidated the policies at stake in the following manner:

> The scope of the exhaustion requirement is best understood in the context

of the Title VII policies which it is intended to further. Because laypersons often initiate employment discrimination complaints and because the policies of Title VII are promoted by encouraging administrative conciliation of employment discrimination complaints, Title VII's procedural requirements are "neither interpreted too technically nor applied too mechanically." *Richerson v. Jones,* 572 F.2d 89, 95–96 (3d Cir. 1978).... The absence of a perfect "fit" between the administrative charge and the judicial complaint is therefore not fatal to judicial review if the policies of promoting conciliation and avoiding bypass of the administrative process have been served.

*Ong v. Cleland,* 642 F.2d 316, 318–19 (9th Cir.1981) (citations omitted).

■ The general purpose of the exhaustion requirement is, therefore, to provide the agency an opportunity to handle the matter by settlement or, if necessary, by righting the discriminatory conduct prior to judicial involvement. Thus, in the usual circumstance, the crux of the inquiry is whether the administrative complaint sufficiently notified the agency of the allegedly discriminatory actions so that the agency intelligently could address the matter. In this context, the administrative complaint "must be construed 'with the utmost liberality.'" *Yamaguchi v. United States Dep't of the Air Force,* 109 F.3d 1475, 1480 (9th Cir.1997) (citing *EEOC v. Farmer Bros. Co.,* 31 F.3d 891, 899 [9th Cir.1994]). Furthermore, "[t]he substance of the administrative charge, rather than its label, is the concern of Title VII." *Ong,* 642 F.2d at 319 (citations omitted).

---

4. The February 2, 1995 letter specifically stated:

> The scope of the investigation will include the following issue(s) only:
> **Specific Issue(s):** Denied employment as a career City Letter Carrier.
> **Date(s) of Incident:** July 22, 1994.
> **Basis(es) of Discrimination:** Race (Black—Non Hispanic).
> If you do not agree with the defined issue(s), you must provide sufficient reasons,

in writing, to substantiate your objections within seven (7) calendar days of receipt of this letter.

*See* Def.'s Mot. in Limine at Ex. A. A February 8, 1995 letter from the EEO investigator assigned to the EEO complaint indicates that the scope of the investigation would include the same issue specified in the February 2, 1995 letter. *See* Def.'s Mot. In Limine at Ex. B.

Although cited by neither party, the *Yamaguchi* case is particularly instructive here. In *Yamaguchi*, the district court had held that the plaintiff's administrative complaint did not include allegations of sex discrimination. *See Yamaguchi*, 109 F.3d at 1480. The Ninth Circuit first explained that, although "less than clear and complete," her complaint described conduct which constituted sexual harassment. *Id.* The Air Force also pressed the point now asserted by Henderson:

> In its investigation and decision, the EEOC only addressed Yamaguchi's sexual harassment allegations against Clark, not her claim of sex discrimination. The EEOC's failure to address the sex discrimination claim, however, is irrelevant to whether Yamaguchi exhausted her administrative remedies on this issue. The district court has subject matter jurisdiction over allegations of discrimination that either "fell within the scope of the EEOC's actual investigation or an EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Farmer Bros.*, 31 F.3d at 899 (internal quotations omitted). An investigation of Yamaguchi's sex discrimination charge could "reasonably [have been] expected to grow out of" her EEOC charge. The fact that no such investigation took place does not preclude federal court jurisdiction over this claim.

*Id.*

Here, there is no dispute but that Hogan's administrative complaint contains every allegation he now presses in this matter. *See* Pl.'s Reply to Defs.' Mot. In Limine Exs. A–1, A. Realizing this, Henderson tactfully directs his attack toward the scope of the EEO investigation. Henderson argues that because the investigator only examined the claim relating to Hogan's denial of the permanent city letter carrier position, Hogan cannot now press the alternative claims which were nonetheless contained in the initial administrative complaint and which are alleged in his second amended complaint to this Court. *Yamaguchi*, however, makes clear that

"[t]he fact that no such investigation took place does not preclude federal court jurisdiction over this claim." *Yamaguchi*, 109 F.3d at 1480. Instead, what governs the analysis is whether the allegations fall within the scope of the actual EEO investigation or an EEO investigation which could reasonably be expected to grow out of the charge of discrimination. *See id.* Although Henderson does not argue the point in precisely this manner, his reliance on Hogan's failure to amend the stated scope of the investigation goes to whether an investigation "could reasonably be expected to grow out of the charge of discrimination." *Id.*

The Ninth Circuit has cautioned that because uncounselled laypersons often initiate employment discrimination complaints, Title VII's procedural requirements should be "neither interpreted too technically nor applied too mechanically." *Ong*, 642 F.2d at 318–19 (quoting *Richerson*, 572 F.2d at 95–96). Viewed in light of this cautionary reminder, even in the face of the February 2, 1995 letter, Hogan could reasonably expect the EEO to investigate allegations in addition to his denial of the career city letter carrier position. A layperson would reasonably expect that the agency charged with the responsibility of investigating allegations of discriminatory employment practices would look into *all* of the allegations substantiated in the affidavit. The February 2 letter does not render such expectation unreasonable. The letter specified the adverse employment action which was the paramount step in an ascending series of allegedly discriminatory acts. Thus, it was reasonable for Hogan to think that the letter's scope limitation was shorthand for all of the preceding conduct as well as the ultimate action. Consequently, an investigation reaching beyond the limited issue of Hogan's denial of the career city carrier position could reasonably have been expected to grow out of Hogan's comprehensive EEO complaint. *See Yamaguchi*, 109 F.3d at 1480.

To allow this motion in limine would fly in the face of the Ninth Circuit's explicit command neither to interpret Title VII's procedural requirements too technically nor apply them too mechanically. *See Ong,* 642 F.2d at 318–19 (quoting *Richerson,* 572 F.2d at 95–96). At the same time, the Court recognizes the EEO's compelling need—particularly in an age where claims of employment discrimination have increased markedly—to limit the scope of its investigations. One would hope that the EEO might include in its letter, as a matter of fairness, an additional sentence directed toward informing the complainant of the future judicial significance of its limiting the investigation's scope. Here the Court denies Henderson's motion in limine. All Hogan's allegations are properly before the Court.

### B. *Henderson's First Motion for Partial Summary Judgment*

Henderson has filed a motion for partial summary judgment arguing that: (1) because Hogan admitted in his deposition that he never requested time off during the period Molina was his supervisor, he cannot prevail on the issue of disparate treatment regarding time off; (2) because Hogan testified that he never complained to another supervisor or upper management regarding his perceptions that Molina was discriminating against him, Henderson must prevail on the issue of employer knowledge; and (3) Hogan's claims of discrimination founder because he is relying only on his subjective belief that he was a victim of such treatment and the questioned conduct was neither objectively abusive nor extreme. The Court addresses these contentions *seriatim.*

#### 1. *Time Off Requests*

■ Hogan alleges that while Hispanic workers were routinely given time off, non-Hispanic workers like himself enjoyed no such benefit. *See* Second Am.Compl. ¶ 21. If based upon race, such disparate

treatment affecting the terms and conditions of employment is precisely the type of evil Title VII is designed to address.[5] Yet, during Hogan's deposition, Henderson's questions yielded an important admission. When asked whether his Hispanic coworkers asked for time off and Molina granted their requests, Hogan responded, "I'm sure that's the way it worked." Hogan Dep. at 105. Yet, when asked whether he ever requested time off, Hogan had just explained, "I didn't ask for it." *Id.* at 104. In his memoranda, Hogan makes no attempt to explain away these statements. The admission is fatal to this claim of discrimination because it is axiomatic that discrimination only lies where similarly situated individuals are actually treated differently. *See Burgess v. State of Washington Dept. of Corrections,* No. 98–35417, 1999 WL 974182, at *3 (9th Cir. Oct. 22, 1999). Here, however, Hogan and his Hispanic colleagues are not similarly situated. Had Hogan made such a time off request and had Molina rejected it, then he and his Hispanic colleagues could properly be compared. Otherwise, they are not similarly situated. Thus, because Hogan admits that he never requested time off, Henderson is entitled to partial summary judgment with respect to this allegation of discrimination.

#### 2. *Employer Liability*

■ Henderson also contends that because Hogan admits that he never complained to a supervisor or any member of upper management regarding his belief that Molina was discriminating against him, the Postmaster General (i.e. Henderson), representing the employer Postal Service, cannot be held liable for Molina's conduct. Hogan responds by referencing the Supreme Court's holding in the sexual harassment case of *Burlington Indus.,* which specified that an employer is subject to vicarious liability for an actionable hostile environment created by a su-

---

5. For purposes of this motion, the Court assumes, without deciding, that the refusal of time off requests constitutes an adverse employment action sufficient to affect the terms and conditions of employment.

pervisor with immediate authority over the employee. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Prior to 1998, the Ninth Circuit rule governing employer liability provided that an employer could be held liable for hostile work environment claims only when management-level employees "knew or should have known" about the ongoing harassment. *See Burrell v. Star Nursery, Inc.,* 170 F.3d 951, 955 (9th Cir.1999); *Nichols v. Frank,* 42 F.3d 503, 508 (9th Cir.1994); *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1515–16 (9th Cir.1989). Under this standard, employers could be held responsible for the conduct of their supervising employees only if they were themselves in some way blameworthy. As a result, the standard shielded employers from liability arising from rogue supervisors who conducted themselves outside the bounds of the scope of their employment and in such a manner that the employer did not actually know nor should have known about the conduct. Henderson argues that neither he nor upper management was ever on notice of Molina's discriminatory treatment of Hogan, so liability for racially hostile work environment discrimination will not lie.

In the companion cases of *Burlington Indus.* and *Faragher v. Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the Supreme Court announced a new test for determining when an employer is liable for a sexually-hostile work environment created by a supervisor. The Supreme Court held categorically that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Indus.,* 524 U.S. at 765, 118 S.Ct. 2257. Of course, the Court recognizes that these two decisions arose in the context of sex discrimination claims,

whereas Hogan alleges racial discrimination. In fact, Justice Thomas noted perceptively in his dissent that, in light of the majority opinion's holding, "employer liability under Title VII is judged by different standards depending upon whether a sexually or racially hostile work environment is alleged." *Burlington Indus.,* 524 U.S. at 767, 118 S.Ct. 2257 (Thomas, J., dissenting). Thus, the question squarely presented is whether *Burlington Indus.* and *Faragher* apply to race-based hostile work environment claims.

The Ninth Circuit has not yet answered this question. *See Williams v. Multnomah Educ. Serv. Dist.,* No. CIV. 97–1197–ST, 1999 WL 454633, at *6 (D.Or.1999). Instead, in an unpublished disposition entitled *Meadowns v. County of Tulare,* No. 98–16412, 1999 WL 685960, at *1 (9th Cir. Sept. 1, 1999), the Ninth Circuit assumed, without deciding, that *Burlington Indus.* and *Faragher* applied to claims of race-based hostile work environment as well as claims of sexually-charged harassment.[6] Other circuit courts of appeal, meanwhile, have addressed this issue and all came to the same conclusion. The Fifth, Sixth, Eighth, and Tenth Circuits have definitively held that these recent Supreme Court sex discrimination cases apply to race discrimination claims as well. *See Deffenbaugh–Williams v. Wal–Mart Stores, Inc.,* 156 F.3d 581, 593 (5th Cir.1998) (this panel opinion was first vacated, then reinstated by the en banc court save one unrelated section, in *Williams v. Wal–Mart Stores, Inc.,* 182 F.3d 333, 333 [5th Cir.1999] ); *Allen v. Michigan Dep't of Corrections,* 165 F.3d 405, 411 (6th Cir.1999); *Gipson v. KAS Snacktime Co.,* 171 F.3d 574, 577 (8th Cir.1999); *Wright–Simmons v. City of Oklahoma City,* 155 F.3d 1264, 1270 (10th Cir.1998). While the *Allen* and *Gipson* courts were quick to conclude that identical standards should be used to evaluate racial and sexual hostile work environment claims, the *Wright–Simmons* court more

---

**6.** For the propriety of referring to an unpublished decision, *see Giese v. Pierce Chemical*

*Co.,* 43 F.Supp.2d 98, 104 n. 1 (D.Mass.1999).

expansively elucidated its reasoning. First, the Tenth Circuit noted that the majority opinion in *Faragher* itself expressed a preference for harmonizing the standards applied in racial and sex discrimination cases. *See Wright–Simmons,* 155 F.3d at 1270; *see also Faragher,* 524 U.S. at 787 n. 1, 118 S.Ct. 2275 ("Although racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards ...."). The Tenth Circuit also recognized that *Faragher* and *Burlington Indus.* did not involve factual circumstances that were particularly unique to sexual harassment cases, e.g., quid pro quo harassment. *See Wright–Simmons,* 155 F.3d at 1270. Moreover, as in the Ninth Circuit, the Tenth Circuit case law had traditionally applied the same standard with respect to employer liability in both racial and sexual hostile work environment cases. *See id.* Also, arguably revealing its intent regarding this question, the Supreme Court used a race discrimination example in explicating its reasoning in *Faragher. See Faragher,* 524 U.S. at 798, 118 S.Ct. 2275. As one district judge sitting in the Ninth Circuit has concluded, "[i]t would be illogical to apply a different standard for employer liability in a Title VII case based on sexual harassment than in a Title VII case based on racial harassment since the Supreme Court has consistently applied the same standards to both types of claims." *Williams,* 1999 WL 454633, at *7. This Court finds the foregoing reasoning persuasive and holds that the standard announced by the Supreme Court's twin sex discrimination opinions applies to employer liability for racially hostile work environment claims.

■ Henderson's motion for partial summary judgment thus must be denied with respect to the issue of employer liability. Henderson's argument relies on the faulty premise that employer liability only lies where the employer knew or should have known about the inappropriate conduct and did nothing to remedy it. Not so.

An employer is now subject to vicarious liability for an actionable hostile environment created by a supervisor with immediate authority over the employee, regardless of the level of knowledge possessed by upper management. *See Burlington Indus.,* 524 U.S. at 765, 118 S.Ct. 2257. Thus, employer liability in hostile work environment cases now turns on the relationship between the victimized employee and the alleged harasser. Where the harasser is a supervisor with immediate (or successively higher) authority over the victim, employer liability will attach. Although Henderson provides probative evidence that the Postal Service could not be held liable for Molina's alleged racial harassment under the analysis required by the former "knew or should have known" rule, this evidence is altogether immaterial to the inquiry now called for by *Burlington Indus.* Consequently, Henderson's motion is denied insofar as it requests summary judgment on the issue of employer liability.

### 3. Severity and Pervasiveness of Hostile Work Environment

■ Henderson's third basis for requesting partial summary judgment pertains to the severity and pervasiveness of Molina's allegedly discriminatory conduct. Title VII provides a remedy for conduct giving rise to a hostile work environment where the employee proves that: (1) he was subjected to verbal or physical conduct of a harassing nature, (2) this conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *See Pavon v. Swift Trans. Co., Inc.,* 192 F.3d 902, 908 (9th Cir.1999) (citing *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 [1986]). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.,*

510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Henderson argues, in short, that even if Hogan's allegations are taken as true, Molina's conduct was neither sufficiently severe nor pervasive, as matter of law, to alter the conditions of Hogan's position.[7] This Court agrees.

■ Hogan complains of two types of conduct that occurred during his service in the Rio Salado facility. First, he alleges that Molina often chatted in Spanish with the Hispanic workers, whereas Molina never chatted with him, nor made him feel welcome in any other manner. Additionally, Hogan alleges that he was often asked to perform the menial tasks while the Hispanic workers were rarely asked to do such tasks. Liability based on a hostile work environment exists where "the workplace is permeated with discriminatory intimidation, ridicule, and insult...." *Harris*, 510 U.S. at 21, 114 S.Ct. 367. In order to establish this claim, the plaintiff "must prove more than a few isolated inci-

dents of enmity" and "[c]asual comments, or accidental or sporadic conversation" will not entitle the plaintiff to relief. *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986). Here, Hogan is unable to point to even one offensive "casual comment," which in any case would not amount to a hostile work environment. *See id.* Hogan in fact admitted that he never heard any offensive language either directly from Molina or from others claiming to have heard Molina disparage Hogan's race.[8] *See Smith v. Planas*, 975 F.Supp. 303, 309 (S.D.N.Y.1997). Although such evidence is often a touchstone for an actionable hostile work environment, one need not, of course, hear offensive language or feel offensive touching in order to have suffered such an environment, provided that the conduct complained of satisfies the severe and pervasive requirement. Here, the fact that his supervisor did not speak to him as often as he spoke to Hogan's Hispanic colleagues fails to add materially to Ho-

7. Curiously, Henderson also contends that a cause of action for hostile work environment arises only where a tangible employment action has occurred. Henderson claims that *Burlington Indus.* requires this result. Henderson, however, seriously misinterprets the case. The Supreme Court's holding specifically addressed the precise question of employer liability and did not speak directly to the elements of a hostile work environment case. *See Burlington Indus.*, 524 U.S. at 765, 118 S.Ct. 2257. Instead, the Court merely utilized the concept of a tangible employment action as a tool to address the employer liability issue there posed. *See id.* at 761, 118 S.Ct. 2257 ("[W]e think it prudent to import the concept of a tangible employment action for resolution of the vicarious liability issue we consider here."). Certainly, where the plaintiff is able to show that the conduct complained of rises to the level of a tangible employment action, then employer liability will necessarily follow. But even where no tangible employment action has occurred, the Supreme Court explains that a claim of hostile work environment discrimination lies, for which the employer will be liable (unless, of course, it can satisfy a two-part affirmative defense). Thus, to the extent that Henderson believes that a tangible employment action is required in order to recover under the hostile work environment theory, he is in error. In fact, the alternative theory of liability under

Title VII alleged here was created precisely to address the sorts of discriminatory conduct that do not rise to the level of the "isolated and distinguishable events" of "hiring, firing, and promoting," but nonetheless result in a work environment so "heavily polluted with discrimination" as to alter the terms, conditions, or privileges of employment. *See Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).

8. In response to questions from Henderson's counsel, Hogan's deposition testimony on this point is clear:

Q: Did he ever make a direct racially-tinged statement to you in conversations, you know, disparaging your racial back-ground or anything?

A: I don't think so, no....

Q: He never used the N-word or anything like that?

A: No, no, no.

Q: Did any of your coworkers come to you and say: Gee, Molina called you a blah, blah, blah?

A: No.

Q: There was nothing? There was no overt statement, racial statement.

A: Not directly to me.
Hogan Dep. at 111.

gan's claim that he suffered a severely abusive workplace. Language can no doubt create barriers to unity within a mixed-language employment environment and it is thus understandable that Hogan felt alienated when his knowledge of English alone, at times, left him outside the social loop. But Title VII does not empower courts to apply a rule of law that would require employers to enforce language restrictions while on the job. There is nothing racist about Hogan's Hispanic supervisor and his coworkers speaking to each other in the language with which each is most comfortable. In addition, nothing in Title VII compels a supervisor to be amiable with any particular employee even when that supervisor pals around with other employees. Friendship relationships are truly a mystifying phenomena for one knows not why any particular pair connects or rubs each other the wrong way. Thus, Title VII permits people to have their differences; what it prohibits is abusive treatment generated from racial animosity. Ultimately, all Hogan can point to is a feeling he has that Molina doesn't speak to him because of this prohibited animosity. But no matter how strongly Hogan is convinced that Molina harbors this prohibited animosity—and the Court does not doubt that Hogan truly believes it—and while this feeling may have made his experience at Rio Salado less comfortable, not being spoken to by one's supervisor is, as matter of law, not severe and abusive treatment.

 Hogan's allegation that Molina asked him to perform menial tasks while his Hispanic co-workers were asked to do the same work only rarely presents a closer question. To be clear, Hogan admits that these tasks were generally within the responsibilities of a casual employee. Instead, his complaint is directed toward the relative number of occasions he was requested to perform such tasks as compared to his colleagues. The Court assumes for purposes of this motion that Hogan subjectively believed that such treatment was hostile. Thus, the question posed for the Court is whether this con-

duct is sufficiently severe and pervasive "to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." Harris, 510 U.S. at 21, 114 S.Ct. 367. If this were a motion to dismiss in which Henderson was arguing that under no circumstances could a claim for hostile environment arise where a supervisor assigns menial tasks only to employees of one race, then the Court might well reject Henderson's contention. One can conceive of a scenario, i.e., the repeated and consistent assignment of workers of one racial group to perform the most arduous or demeaning tasks, that would justify a reasonable person finding such conduct hostile or abusive simply because one has been subjected to demeaning tasks on the basis of race.

Here, however, Hogan is faced not with a motion to dismiss but with one for summary judgment. He can no longer rely on the bald allegations in his complaint with respect to his treatment. See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). Instead, he must bring forth relevant evidence, by affidavit, deposition testimony, or other sources, which tends to show a genuine issue of material fact exists regarding the severity and pervasiveness of the alleged conduct. He marshals no such evidence. Instead, apparently failing to recognize the distinction between the disparate treatment and hostile work environment theories, Hogan simply argues that he has discharged his duty to present a prima facie case of discrimination, and that he has no duty to prove anything further. As a result, the Court is left with Hogan's unsworn statement in his complaint that he was often assigned the menial tasks while Hispanic employees were rarely asked to do these tasks. See Am. Compl. ¶ 23. But even if this were evidence, as is required by Rule 56, the Court could not reasonably infer that the conduct complained of was both severe and pervasive. Hogan fails to specify how many times he was asked to perform these tasks

or how "rarely" his Hispanic colleagues were asked to do these tasks. Thus, a ruling that the conduct was pervasive is impossible. One must remember that whoever has the burden of proof at trial on a particular issue has the burden to produce evidence on summary judgment with respect to that issue as well. Hogan, as the plaintiff in this discrimination case, has the burden to prove at trial that the conduct was severe and pervasive. Having failed to provide evidence on this issue, summary judgment in favor of Henderson is in order on the hostile work environment claim.[9]

### C. Henderson's Second Motion for Partial Summary Judgment

Henderson also moves for partial summary judgment on the key issues of whether Hogan was denied employment first as a casual employee and also as a permanent letter carrier an account of his race. As to each of these adverse employment actions, Hogan alleges that Molina's unjustifiably critical recommendation doomed his candidacy. For the purposes of this motion, the Court assumes that the disputed recommendation actually influenced both decisions. As to both allegations of discrimination, Henderson first contends that Hogan fails to shoulder his burden of establishing a prima facie case of racial discrimination. Henderson argues that because Hogan relies only on his subjective belief that discrimination was afoot but provides no objective evidence to suggest the same, as matter of law he fails to show that he was discriminated against because of his race. Alternatively, Henderson asserts that Hogan was denied the positions because his negative performance evaluations were justifiable. Each

allegation of discrimination is considered in turn.

#### 1. City Letter Carrier Position

█ Title VII of the Civil Rights Act of 1964, as amended, provides that "[a]ll personnel actions affecting employees ... in the United States Postal Service ... shall be made free from any discrimination based on race...." 42 U.S.C. § 2000e–16(a). As a former employee of the United States Postal Service, Hogan claims the protection of this provision. To establish a prima facie case of employment discrimination, a plaintiff must offer evidence that "give[s] rise to an inference of unlawful discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). A plaintiff can establish a prima facie case by providing direct evidence that the "employment decision was based on a discriminatory criterion illegal under the [Civil Rights] Act." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), cited in *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148–49 (9th Cir.1997). If such direct evidence cannot be mustered, the plaintiff can instead rely on the familiar *McDonnell Douglas* framework to give rise to an inference of unlawful discrimination. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Here, because direct evidence is lacking, Hogan must show that: (1) he belongs to a protected class; (2) he applied for and was qualified for a job for which the employer was seeking applicants; (3) he was rejected despite his qualifications; and (4) after his rejection, the position remained open and the employer continued to seek applications from per-

9. To the extent that Hogan is relying only on a disparate treatment theory and not on a hostile work environment theory, summary judgment in favor of Henderson is equally warranted because actionable disparate treatment requires proof of an adverse employment action and courts have consistently held that being assigned to perform demeaning work assignments that are nonetheless within

one's job description does not constitute an adverse employment action. See, e.g., *Stevens v. Glickman*, No. 97–56–SLR, 1999 WL 825603, at *17 (D.Del. Sept. 30, 1999); *Hou v. New York City Dep't of Envtl. Protection*, No. 98 CIV 9569(LBS), 1998 WL 531829, at *2 (S.D.N.Y. Aug. 24, 1998); *Briscoe v. Fred's Dollar Store*, 822 F.Supp. 1353, 1354 (E.D.Ark.1993).

sons with comparable qualifications. *See Cordova,* 124 F.3d at 1148 (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). "The requisite degree of proof necessary to establish a prima facie case for Title VII ... on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994); *see also Sischo–Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1111 (9th Cir. 1991) ("[T]he amount [of evidence] that must be produced in order to create a prima facie case is 'very little.' "). The prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

There is no dispute that, as an African–American, Hogan is a member of a protected class. Furthermore, there is no dispute that Hogan applied for the city letter carrier position. The parties also do not dispute that he was denied the position, which was subsequently filled by other candidates. His proof founders, however, on the "qualified for the position" requirement. *See Fernandez v. Wynn Oil Co.,* 653 F.2d 1273, 1275 (9th Cir.1981) ("If an applicant is not qualified for the job in question, she has failed to establish a prima facie case."); *Kyle v. Campbell Soup Co.,* No. 92–16125, 1994 WL 5756, at *2 (9th Cir. Jan. 7, 1994) (unpublished opinion). With respect to this issue, Hogan provides his EEO affidavit in which he asserts that "it became increasingly clear that I, among our crew, had the best possibility to become a regular postal employee. Some of our crew members had driving problems or didn't pass the postal exam or were not veterans or had other problems that excluded them. I, alone ... met all of the qualifications." Def.'s Reply to Mot. In Limine Ex. A at 4. Hogan also provides his postal exam score and documentation regarding his service in the Air Force as well as a number of

highly favorable reviews from his other supervisors regarding his work as a casual employee. *See* Hogan Aff. Exs. M11, M12, M29. Yet, this evidence simply does not prove that he was qualified for the city letter carrier position.

Nowhere does Hogan describe the duties of a city letter carrier, let alone the qualities a candidate should have in order to carry out those duties. The best the Court can infer from Hogan's contentions is that it is necessary to be a good driver and pass the postal exam. Perhaps veterans are given a preference. But Hogan points to no evidence in the record—by affidavit, deposition testimony, or any other source—regarding the extent to which these qualifications are relevant, if at all. Even assuming that the United States Postal Service is concerned about driving ability, examination scores, and military service, surely there is more to the position of city letter carrier. Yet, the Court is unable to evaluate Hogan's qualifications for the position without knowing what the position entails and the qualifications necessary to perform the position's responsibilities. Furthermore, Hogan's claim that he alone met the qualifications of the position is nothing more than a conclusory statement and simply does not constitute evidence, as is required by Rule 56. *See Forsberg v. Pacific Northwest Bell Tel. Co.,* 840 F.2d 1409, 1418–19 (9th Cir.1988) (holding that conclusory allegations of discrimination insufficient to avoid summary judgment). Rather than provide important details about the position for which he applied and the qualifications he possesses that are relevant to the position, Hogan claims—but fails to provide any objective evidence to suggest—that his coworkers were inferior to him. While a Title VII plaintiff normally need not prove his or her superiority over the chosen candidate in order to establish a prima facie case, this evidence would nonetheless suffice to prove one's qualifications for the position. *See Foster v. Arcata Assocs., Inc.,* 772 F.2d 1453, 1460 (9th Cir.1985), *cert. denied* 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d

576 (1986) ("Foster was required only to produce evidence ... about whether she possessed the minimum qualifications for the job, not whether she was as qualified or more so than the person whom Arcata selected."), *superceded on other grounds by Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262 (9th Cir.1991). Evidence that might bolster Hogan's conclusory allegation would be his coworkers' inferior postal exam scores or documents relating to their poor driving records (again assuming that these factors are even relevant to the position). Instead, the only evidence in the record with respect to his coworkers, including another African–American employee named Kyle Johnson, are a series of evaluations that favorably comment on their performances. *See* Hogan Aff. Exs. M46–M49. Even had he provided objective data proving that, among his coworkers, he was the most qualified, he provides no evidence to suggest that only individuals from his crew were eligible for the position. The Postal Service, presumably, was free to look beyond the group of individuals with whom Hogan worked in order to locate the proper candidates to fill the city letter carrier position. If this were not the case, Hogan needed to provide evidence indicating that the pool of candidates with whom he was competing was limited to his crew.

Furthermore, his earlier favorable reviews regarding his performance as a casual employee are not particularly probative of whether he would be qualified for the city letter carrier position since Hogan has provided no evidence suggesting that the positions were similar. Hogan, of course, could have been a top-notch sorter on the floor of the Rio Salado facility, but nonetheless be ill-equipped to handle the responsibilities of the city letter carrier position—whatever those may be. While the

Court, on summary judgment, is bound to take all reasonable inferences in favor of the nonmoving party, it would be unreasonable for the Court to infer that merely because some supervisors contended that Hogan performed one job for the Postal Service well he necessarily would be qualified to perform any other Postal Service position. Hogan has not proved that he was minimally qualified for the position of city letter carrier. As a result, Hogan fails to prove an essential prong of the prima facie case and thus the presumption of unlawful discrimination does not arise. Consequently, as to this aspect of the case, summary judgment in favor of Henderson is in order.

### 2. Continuing Employment as Temporary Employee[10]

While Hogan clears the prima facie case hurdle with respect to his desire to continue working in the same capacity at the Rio Salado facility, he stumbles in the later stages of the *McDonnell Douglas* analysis. Again, there is no dispute that Hogan is a member of a protected class, that he applied for and was denied the continuing position, and that the Postal Service subsequently filled the position with another candidate. *See Cordova,* 124 F.3d at 1148 (listing elements of prima facie case). There is some question regarding Hogan's qualifications for the position, but unlike his bare, unsubstantiated claim that he was qualified for the city letter carrier position, Hogan presents evidence to indicate his ability to perform the responsibilities of his position as a casual employee. In particular, he not only provides numerous favorable recommendations from supervisors other than Molina, he also points to Molina's January 1994 favorable evaluation. Thus, Hogan satis-

---

**10.** Henderson points out that Hogan had already worked the maximum number of days available in a given year for a casual employee and thus could not be hired as a continuing casual. Hogan admits the truth of Henderson's contention, but nonetheless argues that the Postal Service could have hired

him to perform the same work under the temporary employee classification. Since Henderson does not quarrel with Hogan's representation, the Court will entertain Hogan's claim that he was discriminated against when he was denied continuing employment as a temporary employee.

fies his burden of laying out the prima facie case.

Yet, even though Hogan satisfies his preliminary responsibility of proving a prima facie case, Henderson satisfactorily rebuts the presumption and Hogan fails to show that racial discrimination motivated the decision to deny rehiring him. Once a plaintiff has established a prima facie case, a presumption of employment discrimination arises and the burden of going forward shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the employment action. *See Cordova,* 124 F.3d at 1149 (citing *Wallis,* 26 F.3d at 889); *see also Burdine,* 450 U.S. at 254, 101 S.Ct. 1089.[11] Here, Henderson submits evidence that Hogan was denied the position because his overall performance had been "marginal" and that he required constant supervision due to his wandering away from his work area. *See* Molina Aff. ¶ 10, Ex. I. Poor employee performance is the quintessential legitimate, nondiscriminatory reason explaining an adverse employment action. Having cited it as the motivating reason for the decision and supported it with a contemporaneous writing and deposition testimony, Henderson has borne his burden of going forward.

Since "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff," *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 518, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089), at this juncture—now that the presumption of discrimination is gone—Hogan "must produce specific facts either directly evidencing a discriminatory motive or showing that the employer's explanation is not credible." *Lindahl v. Air France,* 930 F.2d 1434, 1438 (9th Cir.1991) (citing *Steckl v. Motorola, Inc.,* 703 F.2d 392, 393 [9th Cir. 1983] ). Nonetheless, "because of the in-herently factual nature of the inquiry, the plaintiff need produce very little evidence of discriminatory motive to raise a genuine issue of fact." *Id.*

[A]ny indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a factfinder. Once a prima facie case is established ..., summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a Title VII dispute is the "elusive factual question of intentional discrimination."

*Lowe,* 775 F.2d at 1009 (quoting *Burdine,* 450 U.S. at 255 n. 8, 101 S.Ct. 1089).

In *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1220–22 (9th Cir.1998), the Ninth Circuit clarified what amount of evidence was necessary for a Title VII plaintiff to forestall summary judgment after an employer has articulated a legitimate nondiscriminatory reason for the adverse employment action. The court explained that it "depend[ed] upon the nature of the plaintiff's evidence." *Id.* at 1221. The two varying standards "stem[ ] from the Supreme Court's holding that the plaintiff may establish pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Id.* at 1220 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089). The Ninth Circuit explained that when "the plaintiff offers direct evidence of discriminatory motive, [a] triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Id.* at 1221. Among the examples the Ninth Circuit cited as representing direct evidence were *Cordova,* where the employer referred to a Mexican–American employee as a "dumb Mexican," and *Lindahl,* where the employer believed that the female candidates get "nervous" and "easily

---

11. The nomenclature used by the courts in implementing the *McDonnell Douglas* paradigm is distressingly inconsistent and confus-ing. For this Court's understanding of how the process works, *see Terry v. Elec. Data Sys.,* 940 F.Supp. 378, 381–82 (D.Mass.1996).

upset." *Cordova*, 124 F.3d at 1150; *Lindahl*, 930 F.2d at 1438. As the Fifth Circuit has made clear, "[d]irect evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Davis v. Chevron, U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994). Comments such as those in *Cordova* and *Lindahl* directly suggest the existence of bias and no inference is necessary to find discriminatory animus. Thus, because direct evidence is highly probative of the employer's underlying motivation, the amount of such evidence produced by the plaintiff need not be substantial. Alternatively, where, as here, the plaintiff is unable to point to direct evidence, he or she "may come forward with circumstantial evidence that tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable." *Godwin*, 150 F.3d at 1222. Unlike direct evidence, "such evidence of 'pretense' must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate on the basis of [race]." *Id.* The Ninth Circuit's analysis is in accord with the most recent Supreme Court decision on this issue. *See Reeves v. Sanderson Plumbing Prods.,Inc.*, ─── U.S. ───, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000). In *Reeves*, the Supreme Court explicitly held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* As a result, Hogan can withstand Henderson's summary judgment attack if he can show, by specific and substantial evidence, that Henderson's proffered motives were not the actual motives.

Hogan does not meet the challenge. Hogan's primary argument on this point is that Molina's June 1994 negative evaluation could not have been accurate in light of the favorable evaluation Molina completed on behalf of Hogan in January of 1994. A supervisor's assessment of an employee can, however, change over the course of nearly half a year, just as an employee's performance can change over the same duration. There is nothing objectively suspicious about a favorable recommendation being followed some five to six months later by a negative evaluation. Furthermore, the primary reason upon which Molina relies during this lawsuit to justify his decision, i.e., Hogan's often wandering from his workstation without permission, was the same reason he cited in his contemporaneous evaluation. *See Godwin*, 150 F.3d at 1222 (noting that inconsistency between the explanation advanced during litigation and the reasons offered contemporaneously with the adverse employment action constituted relevant evidence of pretext). Hogan fails to provide the "specific" and "substantial" evidence that the Ninth Circuit requires to prove that the offered justification is pretextual. Indeed, he provides no such relevant evidence at all. Consequently, the Court grants summary judgment to Henderson on Hogan's claim that Molina discriminated against him when his allegedly false evaluation resulted in Hogan's failure to be continued as a temporary employee.

## V. *Conclusion*

Pursuant to the foregoing analysis, the Court DENIES Henderson's Motion in Limine (docket no. 68–1) but GRANTS Henderson's two Motions for Partial Summary Judgment [docket nos. 83–1 and 89–1]. As no other issues remain for decision, judgment shall enter for the defendant Henderson.