121 F.Supp.2d 1280 (2000)
Helen M. FOSTER, Plaintiff,
v.
BJC HEALTH SYSTEM, Defendant.
No. 4:99CV01148 CDP.
United States District Court, E.D. Missouri, Eastern Division.
November 13, 2000.
*1281 *1282 Roger G. Brown, Winfred O. Nickens, Roger G. Brown & Associates, Jefferson City, MO, for Helen M. Foster, plaintiff.
Dennis G. Collins, Partner, T. Christopher Bailey, Greensfelder and Hemker, St. Louis, MO, for BJC Health Systems, defendant.

MEMORANDUM AND ORDER
PERRY, District Judge.
In this action, Helen Foster claims that her former employer, BJC Health System, discriminated against her in the benefits and conditions of her employment, and ultimately discharged her, because of her race. Foster's two-count complaint alleges violations of the Missouri Human Rights Act, Mo.Rev.Stat. § 213 et seq., and 42 U.S.C. § 1981. BJC moves for summary judgment, arguing that Foster's MHRA claims are time-barred, that Foster's status as an at-will employee precludes her claim under § 1981, and that Foster has not adduced sufficient evidence of race discrimination. I agree that Foster's MHRA claim is time barred. I will deny the motion with respect to her § 1981 claim.
In determining whether to grant summary judgment, I must view the facts and inferences from the facts in the light most favorable to Foster. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). BJC has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. See Fed. R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once BJC has met this burden, Foster may not rest on the allegations in her pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. See Fed.R.Civ.P. 56(e). "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323, 106 S.Ct. 2548. Finally, in making this determination, I am mindful of the Eighth Circuit's most recent admonition that "summary judgment should seldom be *1283 granted in discrimination cases." Bassett v. City of Minneapolis, 211 F.3d 1097, 1099 (8th Cir.2000). Under these standards I review the facts in this case.

I. Facts

BJC[1] hired Helen Foster, an African American, in 1967. Until 1988, Foster worked as a clerk in BJC's accounts payable department. At that time, an accounts payable clerk's primary duty was to pay invoices that BJC owed. In 1988, BJC promoted Foster and another accounts payable clerk, Suzanne Torrence, to the position of Senior Accounts Payable Clerk. Foster's promotion made her the highest ranking African American employee in the accounts payable department. Torrence, who is white, had worked as an accounts payable clerk at BJC since 1971. After Foster and Torrence were promoted, Foster continued to process a high volume of invoices. Torrence processed fewer invoices, in part because Torrence assumed more new responsibilities than did Foster. In early 1997, BJC promoted two of its four senior clerks to the position of Accounts Payable Coordinator, leaving Foster and Torrence the department's only remaining senior clerks. Until December of 1996, Foster and Torrence worked under the direct supervision of Richard Schellhase, BJC's Accounts Payable Supervisor.
Foster excelled at processing invoices. Schellhase testified that Foster was a "very fast" invoice processor, and his performance evaluations praised Foster's accuracy. Moreover, BJC's accounts payable production summary for 1995 and 1996 suggests that Foster consistently processed many more invoices than the department's other employees.
In 1996, Phillip Cavoretto, Schellhase's supervisor, directed Schellhase to reallocate responsibilities among accounts payable staff. Cavoretto testified that he instructed Schellhase to "make sure the senior clerks [are] performing senior clerk activities." As a result of this reallocation, Foster assumed most of the department's account balancing responsibilities. Current BJC employees testified that Foster had considerable difficulty balancing accounts. For example, Cheri Duffey, an Accounts Payable Supervisor at BJC, claimed to have come into work on more than one weekend to complete backlogged balancing. On the other hand, Schellhase testified that, in his recollection, Foster experienced "no major problems" in performing balancing duties. Moreover, the evidence also suggests that employees other than Foster, including Torrence, found balancing difficult.
Between 1994 and 1995, Schellhase issued three reprimands to Torrence, and ultimately suspended her, for performance reasons. Torrence testified that this disciplinary action helped to improve her performance. Conversely, Foster received no formal discipline or performance counseling while employed at BJC other than routine annual evaluations. Foster's performance evaluations were satisfactory or better until 1997, although the evaluations indicated that Foster needed improvement in some areas. In particular, at least two evaluations stated that Foster should take more initiative in reporting problems with accounts payable clerks to management.
By 1995, BJC had set specific goals for reducing labor costs. It eliminated Schellhase's position in December of 1996. After Schellhase left BJC, Cavoretto became Foster's and Torence's immediate supervisor. In 1997, Cavoretto and BJC's Vice President of Finance, Constance Schmidt, decided to eliminate one of the two senior accounts payable clerk positions. In November of 1997, Cavoretto informed Foster that her position would be eliminated on January 2, 1998. Cavoretto participated in the decisions to terminate Schellhase and Foster.
*1284 A few months before Foster learned that her position would be eliminated, Cavoretto conducted Foster's annual performance appraisal. On this appraisal, Foster received an overall rating of "inconsistently meets expectations." This appraisal was Foster's first unsatisfactory performance review in her thirty years of employment with BJC. Cavoretto's criticisms centered on Foster's balancing difficulties and her purported failure to inform management of problems with accounts payable clerks. This evaluation resulted in Foster's discharge, because BJC's job elimination policy places controlling emphasis on employees' most recent performance evaluations. Foster's position was selected for elimination over Torrence's solely because Foster had a lower 1997 performance evaluation than Torrence. The 1997 evaluation also resulted in Foster's receiving a lower salary than Torrence thereafter. Cavoretto admitted that he did not consult Schellhase before performing the 1997 appraisals, although Schellhase was Foster's and Torrence's supervisor throughout half of the period covered by the appraisal. Cavoretto also testified that, at the time he conducted the appraisals, he suspected that a senior clerk position would be eliminated.
The parties agree that, in November of 1997, BJC had an open accounts payable clerk position. Foster asked Cavoretto about the position at the meeting in which he informed her that her position would be eliminated. In response, Cavoretto asked Foster whether she thought she could do an efficient job in the position. Foster replied that she had worked at BJC for thirty years and that her record spoke for itself. The parties disagree as to what occurred thereafter. Foster testified that Cavoretto made no response, and that she believed from Cavoretto's statements and conduct that he did not want her to continue at BJC. Cavoretto testified that he told Foster that he would check the salary she would receive if she took the position. The evidence construed in the light most favorable to Foster indicates that Cavoretto did not offer Foster the clerk position at the November meeting.
In her deposition, Schmidt testified as follows regarding the company's general practice when eliminating positions:
Q. Now, when you were determining which position to eliminate and you made your decisionyou and Phil Cavoretto made your decision to eliminate Helen Foster's position, did you look for alternate positions for her?
A. I did not look for alternate positions for her.
Q. Do you know if Phil did?
A. I can't say for sure, but ourtypically, we would have talked about whether there was an AP clerk position available and would she be interested in having an AP position.
Q. Would it be fair to say that your policyI guess is the only word I can think ofis that you do try to find a position if one's available?
A. Our general practice was that if we had a position available in our department that she would be eligible for, that she would be offered that position immediately; not that we would try to find her a position. But if there was one there, she would be offered the position.
Within the final two weeks of Foster's employment, Cavoretto approached Foster about the accounts payable clerk position. Cavoretto testified that he informed Foster that she would make $10.86 per hour in the accounts payable clerk position. Foster contends that he simply asked her if she would take a pay cut of "about a dollar." In any event, BJC concedes that, under company policy, Foster's salary should have been $11.73 per hour in the clerk position, about thirty cents less per hour than Foster received as a senior clerk. Cavoretto testified that he arrived at the $10.86 figure "after talking with human resources." Another BJC employee testified that the $10.86 figure apparently *1285 resulted from application of BJC's Wage and Salary Rates policy rather than its Job Elimination Policy.
After Foster's termination, in March of 1998, BJC transferred Kathy Vandergriff, a senior accounts payable clerk at BJC's West-South Region, to BJC's accounts payable department. Vandergriff worked at BJC for two weeks, splitting her time between the two departments. While at BJC, Vandergriff performed some of Foster's former duties. Vandergriff testified that she left BJC's accounts payable department late in March to accept what she considered a better position.

II. Discussion

B. MHRA Claim

Foster bases her MHRA claim upon the termination of her employment and alleged acts of discrimination that occurred during her employment. BJC argues that Foster's MHRA claim is time-barred because she failed to file an administrative complaint within the MHRA limitations period. I agree, and will therefore grant summary judgment as to this claim.
The MHRA requires that a complaint be filed with the Missouri Commission on Human Rights within one hundred eighty days of the alleged discriminatory act. See Mo.Rev.Stat. § 213.075.1 (1996). BJC discharged Foster on January 2, 1998. The MHRA Notice of Right to Sue indicates that Foster filed her administrative complaint on July 1, 1998, exactly one hundred eighty days after her employment ended. BJC, however, informed Foster of its decision to discharge her in November of 1997. When an employee receives notice of termination before the discharge date, the statute of limitations on her discriminatory discharge claim begins to run on the date of notice. See Delaware State College v. Ricks, 449 U.S. 250, 259, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); State ex rel. St. Louis County v. Missouri Comm'n on Human Rights, 693 S.W.2d 173, 174-75 (Mo.Ct.App.1985) (interpreting predecessor of MHRA limitations statute). Therefore, the fact that Foster's employment continued until January 2 does not bring her MHRA claim within the limitations period.
Foster argues that I should analyze this case under the continuing violation doctrine. She alleges that BJC's failure to formally counsel her about her performance problems amounted to a pattern of discriminatory conduct that culminated in her discharge. In order to avail herself of this doctrine, however, Foster must show that a factual issue exists as to whether at least one discriminatory act occurred within the limitations period. See Jenson v. Eveleth Taconite Co., 130 F.3d 1287, 1303 (8th Cir.1997) ("[T]he critical question in the continuing violation analysis is whether any violation occurred during the statutory period."). See also United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). I find that Foster has not made this showing.
Nearly all events relevant to Foster's claims occurred more than one hundred eighty days before she filed her administrative complaint.[2] On an unspecified *1286 date within Foster's final two weeks of employment, Cavaretto gave her incorrect information about the salary she would earn in the accounts payable clerk position. No evidence pinpoints January 2, 1998 as the date this conduct occurred, however, and it therefore cannot satisfy the statutory deadline. Foster does not argue otherwise. Rather, she alleges that BJC replaced her when it transferred Vandergriff to the Clayton Avenue office in March of 1998, and argues that this act constituted part of a continuing violation.
One difficulty with this argument is that replacing an employee who has already been discharged is not a wrongful act. To constitute part of a continuing violation, an act need not alone amount to a violation severe enough to substantiate a discrimination claim. It must, however, amount to wrongful behavior. Cf. Lane v. Ground Round, Inc., 775 F.Supp. 1219, 1225 (E.D.Mo.1991) (holding that alleged harasser's attempts to make small talk with the plaintiff within the limitations period did not comprise part of a continuing violation even in light of earlier harassment). At best, BJC's act of transferring Vandergriff to the Clayton Avenue office amounts to evidence of its motives for discharging Foster. This act did not violate Foster's rights, and therefore cannot be part of a continuing violation.[3]
Moreover, Missouri courts have held that "[i]n order for continual employment discrimination to be established [under the MHRA], it must be found that a continual employment relationship existed, and if the employment relationship be severed by discharge or resignation, any alleged employment discrimination ceases to exist." See Missouri Pac. R.R. Co. v. Missouri Comm'n on Human Rights, 606 S.W.2d 496, 501 (Mo.Ct.App.1980) (citing Rudolph v. Wagner Elec. Corp., 586 F.2d 90 (8th Cir.1978)). See also Conner v. Reckitt & Colman, Inc., 84 F.3d 1100, 1102 (8th Cir. 1996) (stating that employer's refusal to accommodate plaintiff's disability after it terminated her was not a continuing violation because an employer cannot continue to discriminate against an employee when it no longer employs her). The directive of these cases is clear: a violation of an employee's rights that culminates in discharge is complete when the plaintiff's employment ends. No basis exists for distinguishing these decisions from the present case. The essence of Foster's MHRA claim is that BJC discriminated against her in the conditions of employment and that it wrongfully discharged her. Such violations end, at the latest, when an employee ceases working for her employer. Foster's MHRA claim is therefore time-barred.

B. Section 1981 Claim

1. Availability of § 1981 to At-Will Employees

A threshold question in this case is whether Foster, who was apparently an at-will employee, can sue BJC under § 1981. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981 (1994). BJC argues that an at-will employment relationship is not a "contract" for purposes of § 1981. Although the Eighth Circuit has not addressed this issue, BJC's position finds support in case law from this district. See Nofles v. State Farm Mut. Auto. Ins. Co., 101 F.Supp.2d 805, 820 (E.D.Mo.2000); Jones v. Becker Group of O'Fallon Div., 38 F.Supp.2d 793, 795 (E.D.Mo.1999). The courts in Nofles and Jones held that at-will employment is not a contract under § 1981 after concluding that Missouri law does not *1287 recognize at-will employment as contractual. Nofles, 101 F.Supp.2d 805, 819-820; Jones, 38 F.Supp.2d 793, 796-97. A trial court in the Western District of Missouri reached a contrary result, in Filbern v. Habitat for Humanity, 57 F.Supp.2d 833 (W.D.Mo.1999). I conclude that at-will employees can bring § 1981 claims against their employers.
Most states have adopted the "at-will" doctrine. Under this doctrine, either party may terminate an employment relationship at any time and for any reason unless the parties have agreed otherwise. At-will employees have no contractual right to continued employment. See Nofles, 101 F.Supp.2d at 820. Courts and commentators have long recognized, however, that the at-will doctrine operates not as a barrier to contract formation, but as a rule of contract interpretation. See, e.g., Bravman v. Bassett Furniture Indus., Inc., 552 F.2d 90, 92 (3d Cir.1977); Butler v. Walker Power, Inc., 137 N.H. 432, 629 A.2d 91, 93 (1993); Richard A. Epstein, In Defense of the Contract at Will, U.Chi.L.Rev. 947, 951 (1984). The at-will doctrine supplies a default term in employment contracts in which the parties have not specified the employment's duration or the reasons for which the employment may be terminated. See, e.g., Epstein, supra, at 951.
All four circuits that have resolved this question have held that at-will employment is contractual for purposes of § 1981. See Lauture v. IBM, 216 F.3d 258, 261-62 (2d Cir.2000); Perry v. Woodward, 199 F.3d 1126, 1133 (10th Cir.1999), cert. denied, ___ U.S. ___, 120 S.Ct. 1964, 146 L.Ed.2d 796 (2000); Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1018-19 (4th Cir.1999); Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc., 160 F.3d 1048, 1051-52 (5th Cir.1998). But see Gonzalez v. Ingersoll Milling Mach. Co., 133 F.3d 1025, 1034-35 (7th Cir.1998) (suggesting that at-will employees cannot sue under § 1981 but declining to reach the issue). Their rationales differ, however. In holding that at-will employment is contractual, the Second and Fourth Circuits rely heavily on the general common law of contracts. See Lauture, 216 F.3d 258, 261 (citing Restatement (Second) of Contracts § 1 (1979)); Spriggs, 165 F.3d 1015, 1018 ("[T]he lack of an agreed-upon duration does not invalidate the underlying contract itself.") (citing Restatement (Second) of Contracts § 33 cmt. d, illus. 6 (1981)). See also Robinson v. Sabis Educ. Sys., Inc., No. 98 C 4251, 1999 WL 414262, *10 n. 9 (June 4, 1999, N.D.Ill.). The Fifth and Tenth Circuits, on the other hand, rely primarily on the contract law of the state in which the case arose. In these circuits, the issue of whether at-will employment is a contract under § 1981 turns on whether the courts of the state in which the employment relationship was based recognize at-will employment as contractual. See Byers v. Dallas Morning News, 209 F.3d 419, 425 (5th Cir.2000); Perry, 199 F.3d 1126, 1133.
The Second and Fourth Circuits' approach is more persuasive. In interpreting § 1981, I find it appropriate to rely on the common law definition of contract because it is a "settled principle of statutory construction that, absent contrary indications, Congress intends to adopt the common law definition of statutory terms." United States v. Shabani, 513 U.S. 10, 13, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994), quoted in Lauture, 216 F.3d 258, 261. One might argue that, because § 1981 guarantees only "the same right" to contract that white citizens enjoy, § 1981 provides no remedy unless the applicable state law defines the underlying relationship as a contract. The Supreme Court rejected a similar argument in Patterson v. McLean Credit Union, 491 U.S. 164, 182-83, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). In Patterson, the Solicitor General argued that "the language of § 1981, especially the words, `the same right,' require [a court] to look outside § 1981 to the terms of particular contracts and to state law for the obligations and covenants to be protected by the federal statute." Id. at 182, 109 S.Ct. 2363. The Supreme Court disagreed. Id. Patterson creates the strongest *1288 impression that the definition of "contract" under § 1981 does not vary with the intricacies of state contract law. A contrary interpretation would mean that § 1981 "mirrors only the specific protections that are afforded under the law of contracts of each State," a proposition that the Patterson Court found inconsistent with Supreme Court precedent. Id. at 182-83, 109 S.Ct. 2363.[4]
Under common law principles, an at-will employment relationship contains all elements of a valid contract. See Lauture, 216 F.3d at 261 (stating that employee's work performed as consideration for employer's promise to pay constitutes a contract); Spriggs, 165 F.3d at 1018 (when employer offers to pay and employee accepts offer by beginning work, the employee's performance of job duties is consideration exchanged for employer's promise to pay: "The parties' actions thus created a contractual relationship."). The terminable nature of at-will employment does not prevent the relationship from giving rise to contractual rights and liabilities. For example, although at-will employees have no contractual right to continued employment, "an at-will employee would be able to file a breach of contract claim if ... he was not paid the correct amount." Filbern, 57 F.Supp.2d at 835 (quoting Lane v. Ogden Entertainment, Inc., 13 F.Supp.2d 1261, 1272 (M.D.Ala.1998).) Accordingly, most state courts recognize at-will employment as contractual in nature. See Licia M. Williams, Note, Does an At-Will Employee Have a Contract Sufficient to Support a Race Discrimination Claim Against an Employer Under 42 U.S.C. § 1981?, 30 U.Mem.L.Rev. 923, 925 & n. 12 (2000) (collecting cases). Therefore, based on well-established common law principles, I conclude that employment at-will is contractual under § 1981.
Even if the state law governing the employment relationship determines the employment's status as a contract under § 1981, I find that Missouri law does not require a different result. The courts in Nofles and Jones examined Missouri judicial opinions and concluded that at-will employment is not contractual in Missouri. See Nofles, 101 F.Supp.2d 805, 819-820; Jones, 38 F.Supp.2d 793, 796-97. I find this an unduly strict interpretation of Missouri case law.
Missouri, like most states, has adopted the at-will doctrine. Under Missouri's version of the doctrine, an employment relationship is terminable at will unless the parties have agreed to maintain the relationship for a specified period. See Luethans v. Washington Univ., 894 S.W.2d 169, 172 (1995). Missouri judicial opinions contain language which, read literally, appears to suggest that at-will employment is not contractual. For example, Missouri courts sometimes refer to documents embodying specific-duration employment agreements as "employment contracts," and refer to employees subject to such agreements as "contractual employees." E.g. id. While one might interpret this language to mean that at-will employment is not contractual, I believe it simply amounts to convenient shorthand for distinguishing at-will employees from those terminable only for cause. Another example, cited by the courts in Nofles and Jones, is the Missouri Supreme Court's statement that "[a]n essential element to an employment contract is a statement of duration." Id. I doubt that the Missouri Supreme Court intended this language to lay down a rule that atwill *1289 employment is not contractual, particularly given that this somewhat academic question was not before it.[5] Again, it seems likely that the court adopted this terminology as a shorthand method of explaining that, unless the parties have agreed upon a fixed duration, an employee has no contractual right to continued employment. At the very least, the question is sufficiently close to render such language entirely too thin a reed upon which to rest a decision withholding § 1981 relief.
That at-will employees in Missouri cannot recover for breach of contract if terminated without cause does not mean that they have no contractual rights against their employers. Missouri courts have recognized that an at-will employee must have some remedy if her employer withholds compensation and benefits previously earned. See Ley v. St. Louis County, 809 S.W.2d 734, 736 (Mo.Ct.App.1991) ("The thrust of the [employer's] position is that in the absence of a formal written contract employees have no enforceable rights to compensation or benefits promised by the employer. That position is obviously meritless."). I believe that, under such circumstances, a Missouri court would entertain a claim sounding in contract. I therefore conclude that at-will employment under Missouri law is contractual for purposes of § 1981.[6]See Lauture, 216 F.3d 258, 263 n. 6. ("The relevant question [under § 1981] is not whether an at-will employee may be terminated at any time, but whether an at-will employee has any contractual rights at all.").
In addition, I note that § 1981 liability for wrongful termination may arise out of an at-will contract just as it may arise out of any other kind of contract. Although termination of an at-will employee does not amount to a breach of contract, a § 1981 claim does not require a breach of the underlying contract. See Patterson, 491 U.S. 164, 182-83, 109 S.Ct. 2363, 105 L.Ed.2d 132 ("The Solicitor General argues that ... racial harassment in the conditions of employment is actionable when, and only when, it amounts to a breach of contract under state law. We disagree."); Spriggs, 165 F.3d 1015, 1020 (4th Cir.1999) ("Proving a breach of the underlying contract is neither necessary to a successful § 1981 claim, nor, standing alone, sufficient to make out such a claim."). Stated differently, while an employer may terminate an at-will employee *1290 for any reason or no reason, it will incur liability under § 1981 if it does so for a racially discriminatory reason. Cf. Campbell v. AT&T Communications, Inc., No. 91 C 8296, 1994 WL 380620, at *3 (N.D.Ill. July 18, 1994) ("There is no `at-will' defense to a federal discrimination complaint."). Foster may therefore sue under § 1981 despite her at-will status.

2. Sufficiency of Evidence of Race Discrimination

I interpret Foster's complaint as asserting two claims under § 1981: a wrongful discharge claim and a claim that BJC discriminated against her in the conditions of employment. I will evaluate each claim separately.
Foster's § 1981 discrimination claims are subject to the burden-shifting analysis developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and Saint Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). See Hughes v. Ortho Pharm. Corp., 177 F.3d 701, 704 (8th Cir.1999). Under the burden-shifting analysis, Foster must first establish a prima facie case of intentional discrimination. See McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817; Bashara v. Black Hills Corp., 26 F.3d 820, 823 (8th Cir.1994). If she does so, the burden shifts to BJC to articulate a legitimate, non-discriminatory reason for the adverse employment action. See McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. If BJC articulates such a reason, Foster must then demonstrate that BJC's reason is a pretext for discrimination. Id.
Foster may either prove pretext directly, by showing that BJC was more likely motivated by a discriminatory reason, or indirectly, by showing that BJC's explanation is unworthy of credence. See Rose-Maston v. NME Hospitals, Inc., 133 F.3d 1104, 1108 (8th Cir.1998). A showing of pretext may not necessarily be enough, however. The factfinder's rejection of the defendant's proffered nondiscriminatory reasons permits, but does not compel, the inference of the ultimate fact of intentional discrimination. See St. Mary's Honor Center, 509 U.S. at 511, 113 S.Ct. 2742. Foster at all times bears the ultimate burden of establishing the existence of facts which if proven at trial would permit a jury to conclude that intentional discrimination was the true reason for the BJC's action. See id. at 507-08, 113 S.Ct. 2742.

a. Discriminatory Discharge Claim

I find that a factual issue exists as to whether Foster can establish a prima facie case of discriminatory discharge. A plaintiff establishes a prima facie case of discrimination by showing that (1) she is a member of the statutory protected class; (2) she was qualified for the position in question; (3) she was discharged; and (4) that the circumstances surrounding her discharge create an inference of unlawful discrimination. See Berg v. Bruce, 112 F.3d 322, 327 (8th Cir.1997). Where the plaintiff has been discharged as part of a reduction in force (RIF), the fourth requirement is open-ended; the plaintiff must make "some additional showing" that she was terminated because of her race. Holley v. Sanyo Mfg., Inc., 771 F.2d 1161, 1165 (8th Cir.1985). BJC does not dispute that Foster can satisfy the first three prima facie elements. I conclude, moreover, that Foster has produced sufficient evidence to create a fact issue on the fourth element.
I will not restate all the evidence that potentially supports Foster's allegations. BJC concedes that Foster's 1997 performance appraisal, which led to her termination, was Foster's first unsatisfactory appraisal in her thirty years of employment at BJC. In addition, while the record is somewhat unclear on this point, many of Foster's appraisals appear to have been as good as or better than those of Torrence, the white senior accounts payable clerk whom BJC retained. Foster does not dispute that she had some difficulty balancing accounts in 1996 and 1997. However, the record contains evidence from which a fact finder could infer that balancing was difficult *1291 for Torrence as well, and that Foster's difficulties with balancing surfaced primarily because she had more balancing responsibilities than Torrence in 1996 and 1997. There is also evidence from which a fact finder could conclude that Torrence had a significant history of performance problems a few years before the RIF. This evidence does not, of course, conclusively establish that Foster was a better employee than Torrence on the date of the RIF, but it is sufficient to permit an inference that BJC treated Foster differently than a similarly situated white employee.
BJC argues that the fact that it followed its neutral job elimination policy precludes an inference of discriminatory animus. I disagree. BJC's policy places controlling emphasis on an employee's most recent performance appraisal. Foster presented evidence that when Cavaretto conducted her 1997 appraisal, her most recent at the time of the RIF, he was already aware that one of the two senior clerk positions would be eliminated. It also appears that Cavaretto participated in the decision to eliminate a senior clerk position. Under the circumstances of this case, a fact finder could reasonably doubt the neutrality of the process by which Foster was discharged. Such doubt may not alone warrant a finding of discrimination, but I cannot say that BJC's adherence to its policy precludes an inference of discrimination. Cf. McCullough v. Real Foods, Inc., 140 F.3d 1123, 1129 (8th Cir.1998) ("[S]ubjective criteria ... are `particularly easy for an employer to invent in an effort to sabotage a plaintiff's prima facie case and mask discrimination.'").
BJC alternatively argues that the undisputed facts show that it discharged Foster as part of a RIF. In such a case, a triable issue of pretext may still exist if the plaintiff presents evidence that would support a finding that the employer initiated the RIF for a discriminatory reason, or implemented it in a discriminatory manner. See, e.g., Lewis v. Aerospace Community Credit Union, 114 F.3d 745, 745 (8th Cir.1997). In addition, a plaintiff might show that a RIF is a pretext by showing that a purported RIF was not, in fact, a RIF. See, e.g., Gaworski v. ITT Commercial Finance Corp., 17 F.3d 1104 (8th Cir.1994).
Foster has shown the existence of a factual issue as to whether the RIF was a pretext for race discrimination. The record contains evidence from which a factfinder could conclude that BJC, contrary to its general practice, either did not offer, or discouraged Foster from accepting, an accounts payable clerk position that was open when Foster was discharged. In addition, the evidence in this case would permit a finding that BJC misrepresented to Foster what her salary would be if she obtained the position. Under the circumstances of this case, this evidence creates a triable issue of pretext.
Some courts hold that the fact that an employer did not offer the plaintiff a new job after eliminating his former position deserves no weight as a matter of law. See, e.g., Godfredson v. Hess & Clark, Inc., 173 F.3d 365, 374 (6th Cir.1999) ("[A]n employer has no duty to transfer an employee to another position within the company when the employer reduces the work force for economic reasons."). The Eighth Circuit, however, has stated that such evidence may support a finding of discrimination. See Morse v. Southern Union Co., 174 F.3d 917, 923 (8th Cir.1999). See also Throgmorton v. United States Forgecraft Corp., 965 F.2d 643, 646-47 (8th Cir.1992). In this case, a jury might find such evidence especially probative in light of BJC's policies and practices. Schmidt testified that, when BJC eliminated positions, the company's practice was to immediately offer displaced employees any open position in their department that they were qualified to perform. Foster has presented ample evidence that she was qualified to perform an accounts payable clerk position. Evidence that BJC discouraged Foster from accepting the position thus has some tendency to refute BJC's explanation *1292 that it discharged Foster because it eliminated her position.
I note that the record also contains considerable evidence that BJC discharged Foster for legitimate reasons. Weighing this evidence in light of the evidence of discrimination is the fact finder's province. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S.Ct. 2097, 2111, 147 L.Ed.2d 105 (2000). I conclude that genuine issues of material fact preclude summary judgment as to Foster's § 1981 wrongful discharge claim.

b. Discrimination in Terms and Conditions of Employment

Foster's complaint also asserts a claim for "unlawful interference with her right to equally benefit from her employment." Section § 1981(b) provides that "[f]or purposes of [§ 1981], the term `make and enforce contracts' includes ... the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." To defeat a motion for summary judgment as to her claim that BJC discriminated against her in the conditions of employment, Foster must present evidence sufficient to permit an inference that she received less favorable treatment than similarly situated white employees. See Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 259 (8th Cir.1996).
Foster's 1997 performance evaluation resulted in her receiving a lower salary than Torrence following the evaluation. BJC argues that its use of a "merit system" in determining Foster's pay precludes an inference of discrimination. I disagree. An employer that adopts a merit system may not apply it in a discriminatory manner. See Hutchins v. International Bhd. of Teamsters, 177 F.3d 1076, 1082 (8th Cir.1999) (upholding summary judgment after finding no evidence that defendant applied its merit system in a discriminatory manner). I have already concluded that a factual issue exists as to whether Foster and Torrence were similarly situated. For the reasons previously stated, I conclude that Foster has shown the existence of a genuine issue of material fact as to whether she was paid less than a similarly situated white employee. I therefore find it unnecessary to consider whether Foster's claim of discrimination in the conditions of employment could be sustained on additional theories, such as discrimination in the allocation of overtime.

III. Conclusion

In conclusion, genuine issues of material fact preclude summary judgment as to Foster's § 1981 claims. I will grant summary judgment as to Foster's MHRA claims, however, because I conclude that they are time-barred.
Accordingly,
IT IS HEREBY ORDERED that BJC's motion for summary judgment [# 28] is granted as to count II and denied in all other respects.
IT IS FURTHER ORDERED that BJC's supplemental motion for summary judgment [# 31] is denied.
NOTES
[1] The entity now known as BJC Health Systems underwent a series of mergers and name changes between 1992 and 1996. For simplicity, I refer to Foster's employer as "BJC" throughout this order.
[2] Foster does not argue that her claim was timely because she received smaller paychecks than Torrence within the limitations period. Cf. Ashley v. Boyle's Famous Corned Beef Co., 66 F.3d 164, 167 (8th Cir.1995). I note, moreover, that this argument would fail. BJC produced evidence that Foster received less pay than Torrence solely because of Foster's 1997 performance evaluation, which occurred more than one hundred eighty days before Foster filed her administrative complaint. Foster has presented no contrary evidence. At best, then, Foster's salary was a continuing effect of a discriminatory act that took place outside the limitations period. Under the MHRA, like under Title VII, "a distinction exists between a continuing violation, which is actionable, and a continuing impact, which is not." Roberts v. Panhandle Eastern Pipeline Co., 763 F.Supp. 1043, 1049 (W.D.Mo.1991). See also Missouri Pac. R.R. Co. v. Missouri Comm'n on Human Rights, 606 S.W.2d 496, 501 (Mo.Ct.App.1980) (citing United Air Lines, 431 U.S. at 558, 97 S.Ct. 1885). Therefore, assuming that BJC paid Foster less than Torrence within the one hundred eighty day period, this would not amount to a continuing violation.
[3] Some courts have held that limitations periods may be equitably tolled until the plaintiff discovers that she has been replaced by a non-member of the protected class. Because the MHRA's 180-day filing deadline is jurisdictional, however, the doctrine of equitable tolling is inapplicable to this case. See Hill v. St. Louis Univ., 123 F.3d 1114, 1118 (8th Cir.1997).
[4] In Patterson, the Court held that an employer's discriminatory conduct relating to the terms and conditions of continuing employment is not actionable under § 1981. Patterson, 491 U.S. 164, 189, 109 S.Ct. 2363, 105 L.Ed.2d 132. This holding was superseded by § 1981(b), which provides that ("[f]or purposes of this section, the term `make and enforce contracts' includes the making, performance, modification, and termination of contracts, and enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."). 42 U.S.C. § 1981(b). Amended § 1981 in no way undermines Patterson's admonition that state contract law does not circumscribe the conduct actionable under § 1981.
[5] In Luethans, the plaintiff, a veterinarian, claimed that his employer had declined to renew his one-year employment contract in order to retaliate against him for reporting the employer's mistreatment of laboratory animals. Luethans, 894 S.W.2d 169, 170. The court held that the plaintiff could not maintain an action for wrongful discharge, reasoning that declining to renew an employee's contract does not amount to a discharge of the employee. Id. at 172.
[6] Moreover, Missouri courts, like those in other states, appear to recognize the at-will doctrine as a principle of contract interpretation rather than as an obstacle to formation of a contract. Missouri courts have linked the at-will doctrine with a broader rule of contract interpretation that disfavors contractual obligations in perpetuity. See, e.g., Paisley v. Lucas, 346 Mo. 827, 143 S.W.2d 262, 271 (1943) overruled on other grounds by Novak v. Baumann, 329 S.W.2d 732, 733 (Mo.1959). In Paisley, the court interpreted a written agency agreement that did not specify the term of the relationship. Id. In holding that the agency was terminable at will, the court stated:

[I]n this jurisdiction, as in others, courts will only construe a contract to impose an obligation in perpetuity when the language of the agreement compels that construction. ... The period of employment under the contract ... is not definitely ascertainable by any fixed criterion. The duration of the contract was not fixed expressly or by implication. Its expiration does not depend upon the expiration of a period of time, upon the completion of a given undertaking, or upon the happening of some event. A contract for life will be upheld only where the intention, that the contract's duration is for life, is clearly expressed in unequivocal terms.
Id. See also Main v. Skaggs Community Hosp., 812 S.W.2d 185, 187 (Mo.Ct.App.1991) (holding that a contract providing for an indefinite period of employment purported to create an obligation in perpetuity, and that the employment was therefore terminable at will).